# BIRD *v.* UNITED STATES.

No. 306. Argued October 14, 1902.—Decided November 17, 1902.

Bird was twice tried and found guilty of the crime of murder and sentenced to death by the District Court of the United States for the District of Alaska; while an appeal from the first trial was pending in this court, which resulted in reversal, 180 U. S. 356, Congress passed the act of March 31, 1899, to " define and punish crimes in the District of Alaska and to provide a code of criminal procedure for said district," which went into effect July 1, 1899; on June 6, 1900, Congress passed another act for Alaska " making further provision for a civil government in Alaska and for other purposes." On the second trial plaintiff in error contended that these acts deprived the trial court of jurisdiction and that the act of March 17, 1884, establishing the District Court for Alaska was entirely repealed and superseded by the act of June 6, 1900, and the District Court for Alaska to which the indictment was returned was thereby abolished; motions to strike from the docket and in arrest of judgment were denied:

(1) *Held*, that this was not error as the acts of March 3, 1899, and June 6, 1900, together constituted a part of the scheme for the government of Alaska, and it is manifest from the provision in section 219 of the act of March 3, 1899, that " nothing therein contained shall apply to or affect in any way any proceeding or indictment now found or pending, or that may be found for any offence committed before the passage of this act." That Congress did not intend by the act of June 6, 1900, to affect the prosecution of prior offences.

The tribunal provided for by the act of June 6, 1900, whether newly created or an existing one continued, has jurisdiction of all criminal cases embraced by the provision of the act of March 3, 1899.

There is a presumption against a construction which would render a statute ineffective or inefficient, or which would cause grave public injury or even inconvenience.

(2) Where a female witness for the prosecution is designated on the trial indictment and the list of witnesses given to the defendant on the trial by her maiden name, which was the name by which she was known at the time, although she had been married and divorced and had subsequently borne the name of another man with whom she lived, the trial court properly overruled the objections of the plaintiff in error to the testimony on the ground that the name so designated was not her name.

The purpose of section 1033 of the Revised Statutes of the United States requiring that in capital cases the list of witnesses be given to the defendant at least two days before the trial, is to point out the persons who may testify against him, and this is best accomplished by the name the witness bears at the time and not some name that the witness may have had at a prior time.

(3) It was not error to charge a jury, "But in determining this matter under the evidence before you, you must consider the situation of the parties at the time and all the surrounding circumstances, together with the testimony of the witness for the prosecution as well as the evidence of the defendant," on the ground that it in effect declared that even if the testimony of the witnesses for the Government were untrue, it was to be considered in delivering the verdict and because all the defendant's evidence (except his own) was withdrawn from the jury on the issue of self-defence, as it appears that the jury were also instructed that it was their duty "to consider the whole evidence and render a verdict in accordance with the facts proved upon the trial."

(4) There was no error in the following instruction: "Evidence has been offered of the escape of the defendant, or attempted escape, after arrest on the charge on which the defendant is now being tried. This evidence is admitted on the theory that the defendant is in fear of the consequences of his crime and is attempting to escape therefrom; in other words, that guilt may be inferred from the fact of escape from custody. The court instructs you that the inference that may be drawn from an escape is strong or slight according to the facts surrounding the party at the time. If a party is caught in the act of crime and speedily makes an attempt for liberty under desperate circumstances, the inference of guilt would be strong, but if the attempt was made after many months of confinement and escape comparatively without danger, then the inference of guilt to be drawn from an escape is slight; but whether the inference of guilt is strong or slight depends upon the conditions and circumstances surrounding the accused person at the time."

(5) The trial court rightly refused, at the defendant's request, to give the jury any instructions defining principal and accessory, or to submit to the jury to determine whether certain other persons were accomplices, as there were no facts in the case to justify it and the defendant himself testified that he had acted in self-defence.

THE case is stated in the opinion of the court.

*Mr. L. T. Michener* for plaintiff in error. *Mr. W. W. Dudley* and *Messrs. Malony & Cobb* were with him on the brief.

*Mr. Assistant Attorney General Beck* and *Mr. Charles H. Robb* for defendants in error.

MR. JUSTICE MCKENNA delivered the opinion of the court.

Homer Bird was found guilty of the crime of murder and was sentenced to death. On appeal to this court the judgment and sentence were reversed and the case remanded for a new trial. 180 U. S. 356.

A new trial was had resulting again in the conviction of Bird for murder, and a sentence of death by hanging was pronounced against him. To this judgment and sentence this writ of error is directed.

After the first trial and while the case was pending in this court, that is, on March 3, 1899, Congress passed a criminal code and code of civil procedure for Alaska, entitled "An act to define and punish crimes in the District of Alaska and to provide a code of criminal procedure for said district." It went into effect July 1, 1899.

On June 6, 1900, Congress passed another act for Alaska, entitled "An act making further provision for a civil government for Alaska, and for other purposes." 31 Stat. 321.

Plaintiff in error, contending that these acts deprived the court of jurisdiction, when the case was called for trial, moved the court to strike the cause from the docket and order him discharged: (1) because the court had no jurisdiction of the crime charged; (2) because the court had no jurisdiction of the case. The motion was denied. It was renewed again in arrest of judgment, and the grounds of it specifically alleged as follows:

"I. Because there has never been any plea entered in this court by the defendant, the only plea ever made by him being in the District Court for Alaska, established by the act of Congress of May 17, 1884, which was abolished by the act of Congress of June 6, 1900.

"II. Because the court has no jurisdiction of this cause, the indictment herein having been returned into the District Court for Alaska, established by the act of Congress of May 17, 1884,

and not into this court, and there is no law conferring upon this court jurisdiction over indictments returned into said court.

"III. Because this court has no jurisdiction of the offense charged in the indictment herein, in this: The said indictment charges an offense under section 5339 of the Revised Statutes of the United States, while this court has no jurisdiction of crimes except as defined in the criminal code for Alaska."

The motion was denied and an exception was taken. This ruling constitutes the first assignment of error.

1. The act of 1884 provided a civil government for Alaska, and by section 3 it was enacted as follows:

"That there shall be, and hereby is, established a District Court for said district, with the civil and criminal jurisdiction of District Courts of the United States, and the civil and criminal jurisdiction of District Courts of the United States exercising the jurisdiction of Circuit Courts, and such other jurisdiction, not inconsistent with this act, as may be established by law; and a district judge shall be appointed for said district, who shall during his term of office reside therein and hold at least two terms of said court therein in each year, one at Sitka, beginning on the first Monday in May, and the other at Wrangel, beginning on the first Monday in November."

By section 7 it was provided:

"That the general laws of the State of Oregon now in force are hereby declared to be the law in said district, so far as the same may be applicable and not in conflict with the provisions of this act or the laws of the United States."

It was under this law that plaintiff in error was indicted and tried the first time.

The act of March 3, 1899, defined the crime of homicide, and divided it into murder in the first and second degrees, and manslaughter. The act contained a clause, it is conceded, saving the jurisdiction of the court over prior cases and crimes. And it is also conceded that the act is still in force, but it is urged that it has no bearing on the questions presented. It is contended that the act of 1884 was entirely repealed and superseded by the act of June 6, 1900, "both by express enactment and by necessary implication;" that "the District Court for Alaska created

by the act of May 17, 1884, was abolished by the act of June 6, 1900, and an entirely new court created;" and it is hence asserted "that in the absence of a provision in the latter act, transferring criminal causes pending in the old court to the new, the latter had no jurisdiction of indictments returned into the old court;" that "a statute conferring upon a court 'general' jurisdiction in criminal matters, must be construed to refer to and to be limited by the code of criminal law enacted for the Territory, and does not include jurisdiction of any offence not embodied in the code."

The act of 1884, we have seen, established the District Court for Alaska " with the civil and criminal jurisdiction of District Courts of the United States, and the civil and criminal jurisdiction of District Courts of the United States exercising the jurisdiction of Circuit Courts." It also provided for the appointment of a district judge, a governor and other officers. It made provision, as declared in its title, for a civil government in Alaska.

The act of June 6, 1900, is entitled " An act making further provision for a civil government for Alaska, and for other purposes." It provides for a governor and other officers, and its provisions for a court are as follows :

" There is hereby established a District Court for the district, which shall be a court of general jurisdiction in civil, criminal, equity, and admiralty causes ; and three district judges shall be appointed for the district, who shall, during their terms of office, reside in the divisions of the district to which they may be respectively assigned by the President.

" The court shall consist of three divisions. The judge designated to preside over division numbered one shall, during his term of office, reside at Juneau, and shall hold at least four terms of court in the district each year, two at Juneau and two at Skagway, and the judge shall, as near January first as practicable, designate the time of holding the terms during the current year.

" The judge designated to preside over division numbered two shall reside at St. Michaels during his term of office, and shall

hold at least one term of court each year at St. Michaels, in the district, beginning the third Monday in June.

"The judge designated to preside over division numbered three shall reside at Eagle City during his term of office, and shall hold at least one term of court each year at Eagle City, in the district, beginning on the first Monday in July."

Section 5, Title I, declares the jurisdiction of each division of the court to extend over the whole district, and provides for a change of venue from one division or place to another. The act further empowers the judges to appoint their own clerks, commissioners, etc.

Section 10 provides that the " judges (and other officers) pro- vided for in this act shall be appointed by the President, by and with the advice and consent of the Senate," etc., and a salary of $5000 is provided instead of $3000, as under the old law.

Section 25 provides that " the officers properly qualified and actually discharging official duties in the district at the time of the approval of this act may continue to act in their respective official capacities until the expiration of the terms for which they were respectively appointed unless sooner removed." And it is provided in section 368, Title III, as follows :

" No person shall be deprived of any existing legal right or remedy by reason of the passage of this act, and all civil actions or proceedings commenced in the courts of the district before or within sixty days after the approval of this act may be prose- cuted to final judgment under the law now in force in the dis- trict, or under this act. All acts and parts of acts in conflict with the provisions of this act are hereby repealed."

It is upon these provisions that counsel for plaintiff in error rest the contentions which we have quoted. The principal con- tention is that the District Court for Alaska created by the act of May 17, 1884, was abolished by the act of June 6, 1900, and an entirely new court created. The contention is supported with ability, but we do not think that it is necessary to decide it on this record. That Congress did not intend by the act of June, 1900, to affect the prosecution of prior offences is mani- fest from the act of March 3, 1899, *supra.* 30 Stat. 1285. This act, though passed prior to the act of June, 1900, con-

stituted, with the latter act, a part of the scheme of government for Alaska. By the act of March 3, 1899, it is provided "that nothing herein contained shall apply to or in any way affect any proceeding or indictment now found or pending or that may be found for any offence committed before the passage of this act" (section 219). The act was in force at the time of the passage of the act of June, 1900. It constituted then and constitutes now the code of criminal law enacted for the Territory, and the crimes there defined constitute the criminal causes of which the District Court, by the act of June, 1900, is given "general" jurisdiction. Necessarily therefore not only the criminal causes subsequent to the act of 1899, but the criminal causes saved by it, are covered by its provisions. In other words, the tribunal provided by the act of 1900, whether it is newly created or an existing one continued, has jurisdiction of all the criminal causes embraced by the provisions of the act of March 3, 1899. And it makes no difference that the records and files "of the old court" are not made records and files "of the new court." They must be considered as made, as the means of exercising the jurisdiction conferred. It being the intent of Congress to save "any proceeding or indictment" found or pending "for any offence committed before the passage" of the act of 1899 in construing the act of 1900, "some degree of implication may be called in to aid that intent." 6 Cranch, 314. There is a presumption against a construction which would render a statute ineffective or inefficient or which would cause grave public injury or even inconvenience.

We find nothing in the cases cited by plaintiff in error to defeat our conclusion. In *McNulty* v. *Batty et al.,* 10 How. 72, there was a transfer of sovereignty; a Territory became a State, and it was held "the territorial government ceased to exist, and all the authority under it, including the laws organizing its courts of justice, and providing for the revision of their judgments in this court (Supreme Court of the United States) by appeals or writs of error." All that is material in *Freeborn* v. *Smith,* 2 Wall. 160, depends upon the same consideration. In *Insurance Co.* v. *Ritchie,* 5 Wall. 541, it was decided that the act of 1833, which gave the citizens of a State

the right to sue citizens of the same State in the courts of the United States, for cause arising under the revenue laws, was repealed by a subsequent statute, and that therefore the national courts had no longer jurisdiction of such causes. In other words, it was held that, as the jurisdiction depended upon the statute, it was taken away by the repeal of the statute. *Ex parte McCardle,* 7 Wall. 506; *Assessors v. Osbornes,* 9 Wall. 567; *Railroad. Co.* v. *Grant,* 98 U. S. 398, and *United States* v. *Tynen,* 11 Wall. 88, were to the same effect. In the latter case there was not an express repeal of the prior statute, but it was decided that the latter act effected such repeal upon the principle that if two acts are "repugnant in any of their provisions, the latter act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first; and even where two acts are not in express terms repugnant, yet if the latter act covers the whole subject of the first, and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act." This principle plaintiff in error relies on and urges that it was recently asserted and applied in *Murphy* v. *Utter,* 186 U. S. 95. The principle is not pertinent in the view we take of the statutes.

2. One of the witnesses for the prosecution was a woman. She was designated on the indictment by the name of Naomi Strong. It was contended that Naomi Strong was not her name, and plaintiff in error objected to her testimony on the ground that her true name had not been furnished on the list of witnesses given. The objection was overruled and the ruling is assigned as error. At the request of the plaintiff in error the jury was withdrawn and the witness examined before the court as to her name, and she testified that her maiden name was Naomi Strong, but she had been married and divorced. She refused to give the name of her husband. She also testified that she had been divorced ten or twelve years, and upon her divorce she went by her maiden name. Subsequently she went by the name of Byers, when living with a man by that name, and, after meeting the plaintiff in error, she went by his name. She testified that she met the plaintiff in

error in 1893 or 1894, and left New Orleans with him the 1st of May, 1898, to join the expedition to Alaska during which the homicide was committed. She and plaintiff in error traveled as husband and wife under the name of Mr. and Mrs. Bundick.

The ruling of the court was right. Section 1033 of the Revised Statutes of the United States requires that in a capital case the list of the witnesses and jurors shall be delivered to the defendant at least two entire days before the trial. By list of the witnesses is meant a list containing the names of the witnesses, and necessarily this means the names which they then bear and which identify them. The purpose of the statute is to point out to the defendant the person who may testify against him, and that is best accomplished by the name the witness bears at the time, and not some name that such witness may have had at some prior time. The present case demonstrates the sense of this. It does not appear how long the witness had been married, and to have designated her by her married name might have conveyed no information about her. A question could be raised whether the objection to the witness was made in time. *Logan* v. *United States*, 144 U. S. 263.

3. There are errors assigned on the instructions given or refused, and for their understanding an outline of the facts is necessary:

In the spring of 1898 the plaintiff in error, Hurlin, the deceased, Charles Scheffler, R. S. Patterson and Naomi Strong organized a party to prospect in Alaska for gold. Each of the men was to contribute five hundred dollars for purchasing an outfit. Scheffler failed with his contribution, and plaintiff in error furnished something over one thousand dollars. At San Francisco, California, a small steam launch and a scow thirty-two feet long by six feet beam were bought, together with the usual supply of food, clothing, etc.

The party sailed from San Francisco and reached St. Michael, July 4. Shortly after they started up the Yukon River, reaching a point in September about six hundred miles above its mouth, and there determined to go into winter quarters, and for that purpose began the construction of a

cabin. Dissensions arose in the party, and the plaintiff in error and the rest of the party do not agree in their testimony as to who was in fault. A resolution to separate was formed, but its execution was postponed at the request of the plaintiff in error until the cabin should be finished. The cabin was finished on September 26. In the meantime there had been disagreements as to the division of supplies. The homicide occurred on the morning of the 27th of September. The witnesses for the prosecution substantially agree that the party collected for breakfast on that morning—Patterson, Hurlin and Scheffler going first; the plaintiff in error subsequently joining them, he seating himself on his bunk back of the others, and they sat as follows: Patterson on the right, Scheffler in the center and Hurlin on the left.

We may quote from the testimony of the woman. Her statement was substantially corroborated by the others; their statements only varied in some details or differences which arose from their different positions.

"Scheffler and I were talking about a trap I had set to catch some grouse, and—— . . . A.—— we were talking about it, and all at once I heard Mr. Bird's gun click—shotgun—when he broke it it clicked, of course, and I looked up and he had the gun to his shoulder, and in the meantime Mr. Scheffler looked around; I think he fired at Mr. Hurlin, and then Scheffler looked around and held up his hands and told him for God's sake not to shoot him, and I jumped up after he fired at Hurlin, and Mr. Patterson kind of jumped back of me—jumped behind me like, and I asked Bird not to shoot; he had the gun to his shoulder all the time, and I jumped and run; put my head over Patterson's shoulder and run through the boat, and just as I passed him in the boat he fired at Mr. Patterson, and Patterson jumped overboard; whether the shot struck him when he jumped overboard I don't know, and in the meantime I jumps out on the beach, and Mr. Patterson jumps overboard, and Mr. Bird comes running out, climbs over the bow of the boat with two guns in his hand—his own and Mr. Scheffler's—and heads Patterson off; the boat was in the water just kind of half on the beach

and half in the water, and so Mr. Patterson wades around on the side of the boat to get out, and Bird heads him off and tells him not to come near him, and Patterson kept begging him not to shoot him, and Bird up with his gun again and says, 'Bob, you dirty son of a bitch, you're the cause of this,' and shot at him the second time and Patterson came to the beach.

"Q. Well, compose yourself, Mrs. Strong, if you can, and go on and state what occurred there. What happened when Mr. Patterson got to the beach? A. They were all on the beach then, and he begged Bird not to shoot him.

"Q. What did he say to him? A. He held out his hands and told him for God's sake to think of his poor family.

"Q. What did Bird say? A. I don't remember any more what he did say; I think he says, 'Bob, I have thought of our families,' or something like that.

"Q. At the time he fired at Hurlin, did you see what Mr. Hurlin did? Immediately after, as far Hurlin was concerned? Immediately after the shooting of Hurlin, what followed [witness sobs]; what did he do, Mrs. Strong? A. Mr. Hurlin?

"Q. Yes. A. He never moved at all; he sat in the same position when he was shot.

"Q. Did his body change position at all? A. No; just remained that way for quite a while.

"Q. Did you see any evidence of a wound on Mr. Hurlin, anything? A. I saw where there was a hole in his head right here, the left side."

The plaintiff in error claimed to have acted in self-defense. His testimony will be given hereafter in connection with an instruction to which it is more particularly pertinent.

In view of the testimony error is based upon the following instruction given by the trial court:

"In this connection you may consider whether the gun of the defendant was placed at a point near his bed as stated by the witnesses for the prosecution, and whether the defendant took his gun from the point where it was described to have been placed by the witnesses for the prosecution, and whether, without any act on the part of the deceased or either of those

sitting near him, he maliciously from behind the backs of these men, when no attack was made against him in any way, wilfully and maliciously shot the deceased, Hurlin, in the back and side of the head, thereby taking his life ; or, whether the statement of the defendant is true, that a quarrel ensued between himself and Patterson while discussing their accounts; that blows passed between them, and that after hearing the witness Naomi Strong say, ' They are getting their guns,' if he did hear any such thing and if you so find—whether he sprang down to a point near the water barrel and there seized his gun and immediately raising the same shot Hurlin while he, the said Hurlin, was in the act of attempting to draw a gun from his sleeping bag; and if all of that was true as the defendant states, whether he was under the necessity of immediately shooting and killing the said Hurlin in order to protect his own life, or if, as the situation then appeared to him, such necessity of immediately shooting Hurlin in order to save his own life existed.

" If you find from the evidence that the statements of defendant Bird in these respects are true, and that the statement of the witnesses of the prosecution are not true, and that the defendant Bird shot and killed the said Hurlin under circumstances as they then appeared to him necessary for the protection of his own life, then you should find him not guilty. But if you should further find that the statement of the defendant Bird is true as to the acts of the said Hurlin as to obtaining his own gun in the manner he described, and yet the apparent danger was not such as to make it necessary or apparently necessary for him to kill the deceased Hurlin, without giving him any warning—if you find he gave him no warning—and without calling upon him, the said Hurlin, to desist in his efforts to obtain his gun, and that the defendant under such circumstances shot and killed the deceased Hurlin, without apparent necessity therefor in order to preserve his own life, then you should find the defendant guilty of manslaughter at least.

" But in determining this matter, under the evidence before you, you must consider the situation of the parties at the time

and all the surrounding circumstances, together with the testimony of the witnesses for the prosecution, as well as the evidence of the defendant."

The contention of the plaintiff in error is that the last paragraph "qualified the whole instruction and permeated it with two errors;" because it was in effect declared that even if the testimony of the witnesses for the government were untrue it was to be considered in determining the verdict; and because all of the evidence for the defendant (plaintiff in error) except his own was withdrawn from the jury in passing on the issue of self-defence. The instruction is not open to this criticism when considered in connection with other instructions. The rule as to the credibility of witnesses was given in other instructions, and did not have to accompany every ruling, and the jury were instructed that it was their duty " to consider the whole evidence and render a verdict in accordance with the facts proved upon the trial." The injunction was not limited by the paragraph complained of by plaintiff in error. That was preceded by the following:

"In considering whether the killing in this case was justifiable or excusable on the ground of self-defence, the jury should consider all the circumstances attending the killing, the conduct of the parties at the time and shortly prior thereto, and their respective situations at the time. *You should determine from the evidence in this case whether the several parties were situated at the time of the killing as described by the witness for the prosecution or described by the defendant himself.*"

The italics are ours, and manifestly the injunction was to determine from the whole evidence " the respective situations " of the " several parties." And the same injunction was expressed in the concluding paragraph of the instruction. This view makes it unnecessary to consider at length the instruction requested by plaintiff in error, the refusal of which constitutes the eighth assignment of error. It selected and gave certain testimony prominence and attempted to make it determinative of a reasonable doubt of the guilt of the plaintiff in error. If we could concede the correctness of such an instruction the re-

fusal cannot be claimed as error, if the whole case was submitted to the jury, and we think it was.

4. The seventh assignment of error is based upon the following instructions:

"Evidence has been offered of the escape of the defendant, or attempted escape, after arrest on the charge on which the defendant is now being tried. This evidence is admitted on the theory that the defendant is in fear of the consequences of his crime and is attempting to escape therefrom; in other words, that guilt may be inferred from the fact of escape from custody. The court instructs you that the inference that may be drawn from an escape is strong or slight according to the facts surrounding the party at the time. If a party is caught in the act of crime and speedily makes an attempt for liberty under desperate circumstances, the inference of guilt would be strong, but if the attempt was made after many months of confinement and escape comparatively without danger, then the inference of guilt to be drawn from an escape is slight; but whether the inference of guilt is strong or slight depends upon the conditions and circumstances surrounding the accused person at the time."

There was no error in the instruction. It submitted to the jury the attempt to escape as a fact to be considered, not as determinative of guilt, and *Allen* v. *United States,* 164 U. S. 492, applies, and not *Starr* v. *United States,* 164 U. S. 627. Indeed when the state of the record is considered the charge given was as favorable to the accused as the law warranted. The only testimony on the subject of flight related to an escape made by the prisoner in October following his arrest in June. This testimony was objected to not because proof of flight was *per se* inadmissible, but solely on the ground that the escape in question was too remote from the commission of the offence charged and the arrest and imprisonment of the accused to be entitled to go to the jury. The court overruled the objection on the ground that it went to the force of the evidence and not to its admissibility. When therefore the court charged the jury that an attempt to escape "made after many months of confinement" and "comparatively without danger" tended

only slightly to prove guilt, we think the instruction was not amenable to the criticism made of it. In view of the instruction which the court gave, as just stated, we think the court committed no error in not giving a more elaborate instruction on the subject of flight which was asked by the accused. Everything in the charge asked as applied to the case was embraced in the charge given.

5. The plaintiff in error requested the court to give an instruction which defined principal and accessory—expressed the legal value of the testimony of an accomplice and the necessity of its corroboration to justify a conviction, and submitted to the jury to determine whether Charles Scheffler and Naomi Strong were or were not the accomplices of plaintiff in error in the killing of Hurlin. Assuming without deciding that the instruction requested expressed the law correctly, it was nevertheless rightly refused, because there were no facts in the case to justify it. The plaintiff in error testified and claimed to have killed Hurlin in self-defence. His version of the controversy which preceded the homicide was as follows:

"I says to him, [Patterson] 'You fellows are nothing but a pack of thieves; you made ten per cent on them bills in Frisco,' and Patterson says, 'You're a liar;' I says, 'You're another,' and with that we dug into each other.

"Q. And what happened? A. He struck me and I struck him.

"Q. Where did you strike him? A. In the eye, and I knocked him off the sacks and he fell down, and with that Naomi hollers, 'Look out, Homer, they're getting their guns.' Hurlin was coming up with his gun under his sleeping bag, one end of it this way. I shot Hurlin, and Patterson ran to the bow of the boat; he had to stoop like that, and he jumped for his gun and as he did so, I shot him.

"Q. Come to this map and point out just where you were when you shot at Hurlin. A. I was in here; I jumped down here and got the gun and stood right about here; Scheffler and the woman was here.

"Q. Where was Hurlin? A. Hurlin was here, reaching for

his gun under the sleeping bags, and had it under his knee like this way.

" Q. And where was Patterson? A. He was jumping from here over against the edge like—you see the rifle was right in here. I had seen that gun there before, for Scheffler had it out and brought in and set it down there. He was going for that."

It is hardly necessary to point out that this testimony shows the woman to have been an innocent spectator of the fray, and if Scheffler had any guilty connection with what transpired it was not as the accomplice of plaintiff in error. Nor did he become an accomplice by not disclosing the homicide until some time afterward.

We find no error in the other rulings objected to nor do they require particular review.

*Judgment affirmed.*