## ALDERMAN v. UNITED STATES. *

Circuit Court of Appeals, Fifth Circuit.
March 25, 1929.

Rehearing Denied April 23, 1929.

No. 5361.

*Certiorari denied, 49 S. Ct. 515, 73 L. Ed. ——.

500

R. A. Hendricks, of Miami, Fla. (Herman Wepman, of Miami, Fla., and B. E. Hendricks, of Nashville, Ga., on the brief), for appellant.

William M. Gober, U. S. Atty., of Tampa, Fla., Francis L. Poor, Asst. U. S. Atty., of Jacksonville, Fla., and Norman J. Morrison, Sp. Asst. to Atty. Gen., for the United States.

Before WALKER and FOSTER, Circuit Judges, and GRUBB, District Judge.

FOSTER, Circuit Judge. Two indictments were returned in the Southern district of Florida, the first district into which he was brought, against James Horace Alderman, appellant—one charging him with the murder of Victor A. Lamby, by shooting him with a pistol upon the high seas, on a vessel owned by the United States; and the other charging him with the murder of Sidney C. Sanderlin by the same means and at the same time and place. By agreement the indictments were consolidated and tried together. The trial resulted in a verdict of guilty as charged on each indictment, judgments were entered on the verdicts, and Alderman was condemned to death.

The evidence on behalf of the government tended to show the following state of facts:

On Sunday, August 7, 1927, at about 1:30 in the afternoon, the United States Coast Guard patrol boat No. 249, commanded by Sidney C. Sanderlin and with a crew of six men, consisting of Frank Tuten, Joe Robinson, Hal Caudell, Jody Hollingsworth, Victor Lamby, and Frank Lehman, was on its way from Ft. Lauderdale, Fla., bound for Bimini, British West Indies, having on board as a passenger Robert K. Webster, a United States Secret Service operative. When about 38 miles from Ft. Lauderdale, and about 17 miles from Bimini, those on board the cutter saw a motorboat, later discovered to be the V 15997, headed for the Florida coast and coming from the direction of Bimini. Sanderlin decided to investigate her. Several shots were fired from the cutter in the direction of the motorboat as a signal for her to stop, which she eventually did, and in a short while the cutter reached her side. Sanderlin hailed the motorboat and asked where she was bound, and some one on her answered that she was from Miami and bound for Miami. The boats were made fast together, and Sanderlin then went on board the motorboat, and there found the defendant and another man named Weech. Both were unarmed.

Sanderlin searched the motorboat and discovered about 20 cases of whisky. Weech told Sanderlin that he had had hard luck, that he had a wife and children in Miami, and that it was his first trip; that he had gotten enough money to get a small load, and asked Sanderlin if he would not take the liquor and let them go with the boat. Alderman was present and heard this statement. Sanderlin said he could not do that, and then he ordered Weech and Alderman to come aboard the cutter. There was some conversation between Sanderlin and members of his crew about taking the motorboat to Miami, and Sanderlin opened the pilot house door to radio to the Base. Alderman was standing on the deck of the cutter opposite the pilot house, and he reached inside the pilot house, where there were four automatic pistols lying on a table, took up one, and shot Sanderlin in the back, killing him almost instantly, and then shot Lamby, who at that time was standing in or near the doorway of the companion way on the cutter leading into the engine room. Lamby fell into the engine room and was paralyzed as a result of his wound. He died some four days later. Hollingsworth and Webster were on the forward part of the cutter; Hollingsworth receiving the liquor which was being passed over by other members of the crew, all of whom, except those just mentioned, were on the motorboat.

Alderman transferred the liquor back to his boat, lined up the six survivors of the patrol boat on the stern of his own motorboat with their hands up, got another pistol out of the pilot house, fired a shot from it into the deck of the cutter, and said: "Well, it works. I have enough ammunition to finish all of you. I will use your own ammunition on you." He then told Weech to go down and break the gas lines on the cutter and let the gas into the bilge and set it afire. Weech went to do so, and then came up, and said that there was a man down there in the engine room. Alderman replied, "Shoot him." Weech came back and said, "I cannot shoot him." Alderman said, "He has got to die; burn him up in there;" and added, "You are all going to hell now." Weech told Alderman he did not have any matches, and Alderman told him to look in the engine room of the motorboat for some. Weech then got a box of matches, and then Frank Tuten told Alderman he had better start his motor up; that, if Weech threw a match into the engine room of the cutter, it would go up in the air, and none of them would get away from there. Alderman then gave Weech a gun, got another out of the pilot house, and went into the engine room of the motorboat and started the motor, and then went back on deck. Weech then started for the cutter with the matches,

and the motor started spitting and was about to stop. Alderman called Weech back to speed up the motor. Weech went down to speed it up. He did not do it quickly enough to suit Alderman, and Alderman glanced down into the engine room, and then the six survivors, taking advantage of his momentary relaxing of vigilance, rushed him and succeeded in overpowering him, not, however, until he had shot and killed Webster and had seriously wounded Hollingsworth; the bullet destroying one of Hollingsworth's eyes and the impact knocking him overboard.

In addition to that there was testimony as to opprobrious epithets applied to the men by Alderman, and an account of Hollingsworth's swimming in the sea, pursued by sharks, and later being forced to lie with his head down, so as to let the blood run out of his mouth. There was also evidence tending to show that the cutter was typical in appearance of Coast Guard boats and flying the Coast Guard emblems. The motorboat was about 30 feet long and showed no flag when hailed.

Alderman did not deny the shooting of the four men, but entered a plea of self-defense. His testimony in substance was: That he did not know the cutter was a revenue boat. That no one on her was in uniform, and he thought that the men on board were hijackers. That he asked Sanderlin what his authority was to board and search his boat, and Sanderlin declined to disclose it. That Sanderlin said nothing about radioing the Base. That he did not notice the radio cabinet, and did not see Sanderlin attempt to use it. That when Sanderlin was in the center of the pilot house, and he (Alderman) was standing just outside, Sanderlin said: "Now, damn you, I have got you; I am going to fix you just the same as the rest of the rum-runners, Charlie Waite, Red Shannon, and that damn nigger. Red Shannon was killed with his hands in the air, with a ball in the back of his head." That Lamby came in about that time and said: "Yes, damn you; we are going to kill you." Sanderlin and Lamby were not talking loud, and it looked to him as though they had plotted together. Lamby made a dive for a gun, and he (Alderman) grabbed at the same time, got the gun, and shot him in the breast. Sanderlin whirled to grab a gun, and Alderman shot him in the back. That he intended to throw the whisky overboard, and take the other men and the boats into Miami, and turn them over to the police.

The defendant complains of the admission of all of the testimony as to what occurred immediately after the shooting of Sanderlin and Lamby, on the ground that the crimes for which he was on trial had been completed and the subsequent events did not form part of the res gestæ; that the evidence as to other crimes committed subsequent to those for which he was on trial was therefore irrelevant and inadmissible; and that the evidence as a whole could have no other effect than to improperly inflame the minds of the jury and prejudice it against him. These points were raised by objection to the evidence, by a motion to exclude it after it had been admitted, by a motion for a mistrial, and by requests for instructions, all of which were overruled. Error is assigned thereto.

Necessarily, what is part of the res gestæ depends on the facts peculiar to each case. It would be useless to review the authorities cited and relied upon by defendant, as the questions presented may be decided on elementary principles.

There are no limits of time within which the res gestæ can be arbitrarily confined, provided there is but one transaction, and it is not a ground for excluding evidence of circumstances forming part of the res gestæ that the same evidence tends to establish the commission of other crimes by the defendant. See Wharton's Criminal Evidence (10th Ed.) pars. 262–920; St. Clair v. U. S., 154 U. S. 134, 14 S. Ct. 1002, 38 L. Ed. 936.

From the evidence above recited it is evident that from the time Alderman was arrested on his own boat until he was finally subdued and recaptured there was one continuous transaction. Furthermore, Lamby was not yet dead, and Alderman's remarks and actions clearly disclosed his animus against Lamby and the intention to complete his murder. If for no other reason, the evidence was admissible as relevant and competent on this phase of the trial.

The defendant, Alderman, took the stand in his own behalf and testified as above outlined, and also testified that he had lived since his birth in Florida. On cross-examination he was asked if he had not lived in Atlanta, Ga., for a year, and subsequent cross-examination developed that he had been convicted on a liquor charge and sentenced to the federal penitentiary in Atlanta for a year and a day, and also that he had been convicted in the state courts of Florida for grand larceny. He was asked about other convictions, which he denied. This was objected to, on the ground that the cross-examination was not germane to the examination in chief; that the proof of crimes and offenses for which he had been convicted put his character in

502

issue, when he had not done so himself; and that the evidence was not relevant to the case on trial.

■ It is well settled that the extent of cross-examination is in the sound discretion of the court, and wider latitude is allowed in cross-examining a party. Rea v. Missouri, 17 Wall. 532, 21 L. Ed. 707. When a defendant takes the stand, he is subject to the same rules in regard to cross-examination as any other witness, and he may be asked questions that would tend to impeach his credibility. Reagan v. U. S., 157 U. S. 301, 15 S. Ct. 610, 39 L. Ed. 709. A witness may be asked if he has been in prison (Wharton, Cr. Ev. [10th Ed.] par. 474), and that was all the cross-examination developed. There was no attempt made to rebut his testimony as to the convictions he denied. In view of the other evidence in the case, it could hardly be said the allowance of the cross-examination was prejudicial error.

In addition to the admission of the evidence above set out, defendant's motion for a mistrial was based on the ground that the jury had been permitted to read the daily papers, carrying accounts of the trial as it progressed, and that the Miami Daily News contained an article headed, "Alleged Pal of Alderman Held," with the statement that one Charles Goings was arrested on an island near Ft. Meyers on a charge of smuggling aliens into the country, on a Department of Labor warrant which alleged that he and Horace Alderman had landed a party of 19 aliens on a key off Homestead the previous July. Aside from the allegation in the motion for a mistrial, there is nothing in the record to show that the jurors had read the article in question, or that they had been prejudiced thereby. In fact, it is not shown that the paper was read by the jury at all. We find no merit in this assignment.

The defendant asked a number of special instructions. It is unnecessary to set them out in full, but in substance the court was requested to charge that, if the persons on board the patrol boat had no reasonable grounds to believe that Alderman and Weech were engaged in any unlawful act, were committing no crimes against the revenue laws of the United States, and were upon the high seas more than 12 miles from any American shore, that the firing upon the boat which caused her to lay to and the subsequent search were unlawful; that, if Alderman took the life of the deceased to prevent an unlawful search and seizure of his boat and of his person, then such act would be justified, and he should be acquitted. These requests were based upon the theory that the boat was Alderman's home, and a search warrant was necessary to enter it; that the Coast Guards have no authority on the high seas beyond the customs limit of 12 miles, and that he was well within his legal rights in possessing and transporting liquor on the high seas.

The special charges requested were refused, and the court charged the jury in substance that the Coast Guards had the right to stop, search, and seize the motorboat because she had departed from Miami for Bimini without clearance. The charge of the court as given was not objected to, but we are asked to notice plain error arising on the record in connection therewith, and error is assigned to the refusal of the special requests.

■ It is elementary that, though a requested instruction states the law correctly, it must be refused if there are no facts in the case to justify it. Regardless of whether the search of the motorboat was legal, there is no doubt from the evidence that Alderman had not objected, and did not seek to resist it by force. His defense is that he committed the homicides in defense of his own life, after Sanderlin and Lamby had told him of their intention to murder him. His subsequent acts had no relation to the seizure and search of his boat. The requested instructions could have been properly refused for that reason. Bird v. U. S., 187 U. S. 118, 23 S. Ct. 42, 47 L. Ed. 100.

■ Passing this, for the purpose of considering appellant's contentions, it is settled that Sanderlin, as commander of the Coast Guard boat, had the authority to stop, board, and search an American vessel beyond the 12-mile limit in proper circumstances. Maul v. U. S., 274 U. S. 501, 47 S. Ct. 735, 71 L. Ed. 1171. As he is dead, we do not know what particular circumstances he relied on for the action he took; but he was vested with considerable discretion, and without doubt he considered them sufficient to justify his initial investigation. Having boarded the motorboat, he may be presumed to have discovered that she had departed on a foreign voyage from Miami for Bimini without proper clearance papers, as it was conclusively shown that she did not in fact clear. A seizure of the boat for violation of the navigation laws was therefore legal. 19 U. S. C. 498 (19 USCA § 498); 46 U. S. C. 91 (46 USCA § 91).

■ He did not need a search warrant to search the motorboat. Carroll v. U. S., 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790. The legality of the search and seizure would be material only on a prosecution

of Alderman, or a proceeding against the vessel, under the navigation and revenue laws. There was no question as to the violation of those laws, whether it subsequently developed that the evidence obtained by the search was admissible or not. There was no justification for the use of force by Alderman in the circumstances disclosed.

It was not error to refuse the special charges requested. The general charge was lengthy, but was fair to appellant and fully covered the law.

Other errors assigned are without merit, and were not pressed in argument. The record discloses no reversible error.

Affirmed.