Larry SELTZER, Petitioner,

v.

INDUSTRIAL CLAIM APPEALS OFFICE OF the STATE of Colorado and Division of Employment, Respondents.

No. 04CA0385.

Colorado Court of Appeals,
Div. II.

Jan. 13, 2005.

Larry Seltzer, Pro Se.

Ken Salazar, Attorney General, Laurie K. Rottersman, Assistant Attorney General, Denver, Colorado, for Respondent Industrial Claim Appeals Office.

No Appearance for Respondent Division of Employment.

ROTHENBERG, J.

Petitioner, Larry Seltzer (claimant), seeks review of a final order of the Industrial Claim Appeals Office (Panel) that affirmed a hearing officer's decision disqualifying him from receiving Temporary Extended Unemployment Compensation (TEUC–A) benefits, which are available to certain airline-related workers pursuant to the Emergency Wartime Supplemental Appropriations Act (Act), Pub.L. No. 108–11, § 4002(a), 117 Stat. 559, 607 (2003). We set the Panel's order aside and remand for further proceedings.

I.

Claimant was employed as a technical analyst and performed computer programming work for Galileo International (employer). He worked on and wrote computer programs, including programs for individual airlines, that enabled passengers to book airline flights on the Internet.

Employer laid claimant off in October 2001. The hearing officer initially determined that his separation was caused by a "lack of work result[ing] from a reduction in business for the employer because the public and corporate customers stopped flying as a result of [the events of September 11, 2001]." However, the hearing officer found that claimant was not entitled to receive TEUC–A benefits because his "layoff was not due to a reduction in services provided by the certified air carriers but was caused by a reduction in business when people stopped booking airline seats thereby not using the employer's services."

Claimant appealed the decision, contending he was not notified he would have to prove his employer's loss of revenue was due to a decrease in air flights. The Panel agreed with claimant that "he was not provided with notice of the dispositive factual issue" and remanded for additional proceedings to allow "claimant the opportunity to present relevant evidence concerning whether his separation from employment was attributable to a reduction in services provided by an air carrier."

On remand, claimant presented evidence that after September 11, 2001, his workload decreased because airlines scheduled fewer flights and because fewer people were flying.

The hearing officer issued a modified decision that again denied claimant benefits. The hearing officer found that (1) "claimant's testimony establishes that it was the flying public's reluctance to fly [after September 11, 2001] and the reduction in the purchase of airline tickets that caused the reduction in flights"; (2) "claimant's lack of work was not due to a reduction in service by a certified air carrier, but was due to the public's reluctance to fly"; (3) "[e]ven on reduced schedules, airlines were flying at only 40% of capacity, leaving 60% of the seats unsold"; and (4) these circumstances caused claimant's job separation. On review, the Panel affirmed.

II.

Claimant contends the Panel erred in affirming the hearing officer's determination that he was not entitled to TEUC–A benefits. We agree.

"[T]he TEUC Act of 2002 created federally funded unemployment compensation benefits for individuals who have exhausted their state and federal unemployment compensation benefits and who qualify to receive TEUC benefits." *Chiccitt v. Unemployment Comp. Bd. of Review,* 842 A.2d 540, 542 (Pa.Commw.Ct.2004).

In 2003, the Act was amended, and special rules were created for determining eligibility for certain displaced airline-related workers who may qualify for additional benefits identified as TEUC–A benefits. *See* Workforce Security Programs: Unemployment Insurance Program Letter Interpreting Federal Law (UIPL No. 30–02, Changes 2 & 3), 68 Fed.Reg. 35429 (June 13, 2003). The Department of Labor(DOL) issued a letter with the stated purpose "to provide State Workforce Agencies (SWAs) instructions for implementing the changes to the TEUC program related to displaced airline and related

workers." The instructions state that "SWA's are required to continue to follow the [DOL's] interpretation of the TEUC Act." 68 Fed.Reg. at 35429.

The DOL instructions recognize that certain procedures "may differ from state law provisions." For example, the instructions provide that late information received from the employer must be considered, and if it supports a denial of benefits, "a redetermination must be issued." 68 Fed.Reg. at 35441. To the extent state law differs from the DOL instructions, the DOL instructions control in determining a claimant's eligibility for TEUC–A benefits.

To be eligible to receive TEUC–A benefits here, claimant was required to demonstrate "qualifying employment" under the Act. That showing had two components. First, he had to establish that his employment was sufficiently tied to the airline industry. As pertinent here, he had to demonstrate that his employment was "with an upstream producer or supplier for an air carrier." *See* Pub.L. No. 108–11, § 4002(a)(2)(A).

The hearing officer found that claimant established the first requirement by showing a sufficient nexus between his employment and the airline industry. As the Panel noted in its initial order, the hearing officer found, in effect, that employer provided contract services to an air carrier. Although this was an issue during the first hearing, by the time of the second hearing, it appears that employer's status as an upstream producer or supplier for an air carrier was no longer in dispute.

The second requirement is that claimant establish he became separated from his employment based upon a qualifying reason. Specifically, he was required to show his separation was "due, *in whole or in part,* to . . . reductions in service by an air carrier as a result of a terrorist action or security measure." *See* Pub.L. No. 108–11, § 4002(a)(2)(B)(i) (emphasis added). The Act defines "terrorist action or security measure" as "a terrorist attack on the United States on September 11, 2001, or a security measure taken in response to such attack." *See* Pub.L. No. 108–11, § 4002(a)(7).

The DOL instructions require that a form be sent to the employer requesting information regarding the claimant's eligibility for TEUC–A benefits. The record in this case includes the form sent to claimant's employer asking whether he was laid off from employment "due to a loss of business, in whole or in part, caused by [among other reasons]: [t]he reduction in airline services following the events of September 11, 2001, or related security measures." Employer answered "Yes" to this question.

The DOL instructions also explain what occurs where, as here, the state disagrees with the employer's conclusion regarding a claimant's TEUC–A eligibility:

Question: Information provided by the employer indicates that the employment is "qualifying employment," but the state has reason to doubt the accuracy of this information. Is the state required to accept the employer's statement?

Answer: No. *However, the state must have credible information to refute the employer's assertion and to support a determination of TEUC–A ineligibility.*

68 Fed.Reg. at 35443 (emphasis added).

Thus, once the employer asserts that a claimant is eligible for TEUC–A benefits, the state must present credible information to refute that assertion. At issue here is whether the hearing officer erred in finding that the Division made such a showing, and whether, in doing so, it properly applied the federal statute. We conclude the hearing officer and the Panel erred as a matter of law in construing the statute. Accordingly, we remand for further proceedings so that the hearing officer may apply the proper standard and determine whether the Division refuted employer's assertion of eligibility.

The hearing officer is the sole arbiter of conflicting evidence, and the hearing officer's factual findings are binding on appeal if they are supported by substantial evidence or plausible inferences from the record. *Davison v. Indus. Claim Appeals Office,* 84 P.3d 1023 (Colo.2004); *Postlewait v. Midwest Barricade,* 905 P.2d 21, 24 (Colo.App.1995).

However, the question of statutory construction is the traditional province of the courts. *Colo. Dep't of Labor & Employment v. Esser,* 30 P.3d 189 (Colo.2001); *Bd. of*

*County Comm'rs v. Vail Assocs., Inc.,* 19 P.3d 1263 (Colo.2001).

In *Salomon Forex, Inc. v. Tauber,* 8 F.3d 966, 975 (4th Cir.1993) discussed the analysis used to determine the meaning of a federal statute:

> The analysis begins, as with the interpretation of any legislative enactment, with the language of the Act, and if that conclusively reveals Congress' intent, the analysis ends. In arriving at the plain meaning, we apply long recognized principles of interpretation. We assume that the legislature used words that meant what it intended; that all words had a purpose and were meant to be read consistently; and that the statute's true meaning provides a rational response to the relevant situation. Conversely, we presume that language added by amendment was not mere surplusage; that undefined terms mean no more than the language imports; and that a statute is not self-contradictory or otherwise irrational.

At the remand hearing in this case, claimant presented uncontroverted evidence that after the events of September 11, 2001, his workload was reduced because there were fewer scheduled flights; people were afraid to fly, and therefore fewer people were doing so; and as a result, there was significantly less use of employer's computer system, which resulted in his job layoff.

The Division did not call any witnesses with personal knowledge of the facts. But two Division representatives at the hearing reiterated the Division's position that a shortage of passengers wanting to book flights was insufficient to show a "reduction in service."

The hearing officer asked the Division representative: "You gave a definition of reduction in service. Where did that come from?" The Division representative answered:

> This came from the continual updates that we get from the federal government clarifying the airline extension program, who's eligible, who isn't, some questions and answers, explaining why somebody might be eligible versus why somebody else might not be eligible for the program.

In this particular case, they are talking about security screeners who lost their jobs because of a loss of contract and the dispute was whether that loss of contract was due to increased security measures . . . .

During cross-examination of the Division representative, claimant's counsel asked: "And you're equating reduction in flights to reduction in services?" He answered: "[Y]es, that's true. The federal government has said a reduction in flight[s] is a reduction in—or reduction in services is a reduction in flights."

There are no exhibits in the record from the hearing, and both parties have attached the same version of the DOL instructions to their briefs. The only reference to security screeners in these instructions is as follows:

> Question: The [Transportation Security Administration] announced that later this year it will cut 11% of the security screeners at the nation's airports. Does this employment at airports with the TSA constitute a "qualifying employment" for TEUC–A purposes?

> Answer: No. These layoffs are not due to a qualifying reason for separation, i.e., layoffs due to a reduction in service by the certified air carrier due to the September 11, 2001, terrorist actions . . . .

68 Fed.Reg. at 35443.

We assume, however, the Division is referring to an attachment to its brief filed October 7, 2003, which is a forwarded e-mail to an unidentified person from an unidentified person. According to the Division's brief, the attachment provides guidance concerning security screeners and states, "There has to be a connection between the individual's separation and a reduction in service by the air carrier (i.e., less flights, no need for the individual's services) or the closure of an airport, rather than simply security measures undertaken as a result of the 9/11 terrorist attacks." Although neither party has cited any portion of the Federal Register verifying this language, claimant's attorney did not question its existence at the hearing. Thus, we have no reason to doubt its validity.

The hearing officer found that there was, in fact, a reduction in scheduled flights and that such reduction was caused by "the flying public's reluctance to fly and the reduction in the purchase of airline tickets." But the hearing officer adopted the legal position of the Division that a shortage of passengers wanting to book flights was insufficient. The Panel adopted the same interpretation, stating that "there must be a causal connection between any reduction in flights and the claimant's unemployment," and that a *"shortage of passengers wanting to book flights" was insufficient* (emphasis added).

The phrase "reductions in service" is not defined in the Act itself, and the only two reported cases we have found addressing TEUC–A benefits offer no guidance on this issue. *See Hempfling v. Unemployment Comp. Bd. of Review,* 850 A.2d 773, 777 (Pa.Commw.Ct.2004)(employer disputed claimant's request and presented credible evidence that her unemployment was due to an economic decline in technology-related industries in general; claimant's evidence was "entirely hearsay" and uncorroborated); *Chiccitt v. Unemployment Comp. Bd. of Review, supra* (employer asserted that claimant was separated from employment because employer could not afford to continue to employ him).

Because the federal statute does not specifically define the phrase "reductions in service," we must construe it in accordance with its ordinary or natural meaning. *See Smith v. United States,* 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993); *United States v. Floyd,* 81 F.3d 1517, 1523 (10th Cir.1996) ("In interpreting Congressional intent, a reviewing court must determine whether the language used in a statute is ambiguous, or whether it has an ordinary meaning.").

"Reduction" means "the amount by which something is lessened or diminished." *American Heritage Dictionary* 1167 (4th ed.2002). "Service" means "the employment in duties or work for another," *American Heritage Dictionary, supra,* at 1267, and "useful labor that does not produce a tangible commodity." *Webster's Ninth New Collegiate Dictionary* 1076 (1989).

Based upon these definitions, we conclude the phrase "reductions in service by an air carrier" is not limited to a decrease in the number of flights offered or provided by such a carrier, but is broad enough to include reductions in other services offered or provided by an air carrier.

Under the hearing officer's and the Panel's interpretation, if, for example, a catering company whose sole business is providing 1000 flight meals per week to an airline, needed only 250 meals per week after September 11, and was forced to lay off three of its four cooks, the separated cooks would receive benefits if the airline reduced the number of flights offered. But they would *not* receive benefits if the airline maintained its existing schedule and simply had fewer people on each flight. Yet, the effect on the employer and the workers would be identical under either scenario.

While Congress obviously did not intend to provide TEUC–A benefits to all airport-related employees, we doubt that it intended such an illogical result when it provided emergency economic relief to unemployed workers under the TEUC. *See Bird v. United States,* 187 U.S. 118, 23 S.Ct. 42, 47 L.Ed. 100 (1902); *Salomon Forex, Inc. v. Tauber, supra; U.S. v. Blasius,* 397 F.2d 203, 207 n. 9 (2d Cir.1968)("There is a presumption against construing a statute as containing superfluous or meaningless words or giving it a construction that would render it ineffective.").

We therefore conclude the hearing officer and the Panel erred as a matter of law in interpreting the statute so narrowly. The findings that there was a substantial drop in flight demand and passenger traffic, and that there was a corresponding reduction in the demand for employer's services, did not preclude a determination that claimant's separation was "due, in whole or in part, to reductions in service by an air carrier" and thus a finding that claimant was eligible for TEUC–A benefits.

Because the hearing officer and the Panel applied an incorrect legal standard to the facts, the case must be remanded for further proceedings. *See Colo. Div. of Employment & Training v. Parkview Episcopal Hosp.,*

725 P.2d 787 (Colo.1986); *ABC Disposal Servs. v. Fortier*, 809 P.2d 1071 (Colo.App. 1990)(courts are not bound by an agency's decision that misconstrues or misapplies the law).

Given our determination, we need not address claimant's remaining arguments.

The Panel's order is set aside, and the case is remanded with directions to remand to the hearing officer for further proceedings and a determination whether claimant's separation was due, at least in part, to reductions in service by a certified air carrier.

Judge CASEBOLT concurs.

Judge CARPARELLI dissents.

Judge CARPARELLI dissenting.

I dissent because the record supports the hearing officer's findings of fact and, in my view, the hearing officer and the Panel applied the correct legal standard to those facts. Therefore, I would affirm.

### I.

As the majority notes, the hearing officer is the sole arbiter of conflicting evidence, and this court is bound by the hearing officer's findings when they are supported by substantial evidence. *Davison v. Indus. Claim Appeals Office*, 84 P.3d 1023 (Colo.2004).

### A.

Here, the hearing officer received testimony that travel agencies and other subscribers access Galileo's computer system by way of the internet to reserve hotel rooms, rent cars, and purchase tickets for air travel, cruises, and tours throughout the world.

At the first hearing, claimant testified that he wrote computer programs that enabled the internet reservations to be manipulated into a form that the airlines' secure computer systems could accept. According to claimant, Galileo received a fee for every seat that was purchased, and when consumers stopped booking flights on airlines after September 11, Galileo's revenue went down. He testified that the problem was "not that necessarily there were fewer airline flights, there were fewer people flying," and that was the source of Galileo's revenue. In response to a question from the hearing officer, claimant agreed that fewer seats were being purchased and that it was not necessarily true that fewer seats were available.

Claimant also explained that, when Galileo offered a new product or when a new website wanted access to Galileo's computer system, his unit wrote supporting computer programs. He testified that when Galileo's revenue went down, it was no longer able to justify continuing development work on its system.

The hearing officer found that, after September 11, there was a reduction in internet purchases of air travel by consumers and this caused Galileo's income to decrease. Consequently, Galileo decided to use the existing computer programs and no longer needed to develop the new programs that claimant created as part of his work.

Based on these findings, the hearing officer concluded that claimant's separation was "not due to a reduction in services provided by the certified air carriers but was caused by a reduction in business when people stopped booking airline seats thereby not using [Galileo's] services." The record supports these findings of fact.

However, the Panel remanded to give "claimant the opportunity to present relevant evidence concerning whether the separation from employment was attributable to a reduction in services provided by an air carrier."

### B.

At the second hearing, claimant's counsel argued that claimant's separation was due to lack of work

> directly related to the reduction in flights as well as the reduction in passengers after the events of [September 11]. There were ... fewer questions by consumers and travel agents because there were fewer people utilizing the airlines. And whether it's because they were afraid to fly or because the airlines were losing money is irrelevant. There was less of a need.

There was a lack of work ... immediately following [September 11].

Claimant testified that Galileo had a problem log and that when airlines, travel agents, or internal users complained that a program was not working properly, Galileo created a repair order. He explained that he worked from the problem log to resolve those problems. He testified that he spent between 35% and 50% of his time attending to those problems on a weekly basis. Claimant testified that, after September 11, his work decreased significantly. Although he worked on maintenance 23.5 hours during the week of August 26, he performed only 7.5 hours of maintenance during the week of October 7.

He testified, "There were fewer flights, fewer people flying and less use of the system. Consequently, fewer problems were showing up." Claimant testified that, after September 11, there were significantly fewer bookings because there were fewer flights, and many of the flights were only 40% full.

Claimant also testified that he was working on several new programs that were delayed, three of them indefinitely, and that Galileo was accomplishing its work with fewer people.

The hearing officer found as follows:

Travel agents were the users of the system that claimant worked on and the airlines were the vendors. The travel agents sold tickets from the airline's inventory. There is no evidence that there wasn't a continuing inventory of plane tickets for ticket agents to sell. The ticketing system was used less by the travel agents because the public was not buying plane tickets. The claimant stated that because of the lack of demand by the ticket-buying public, airline flights were reduced. The claimant stated that flights were at 40% of capacity establishing that seats on airplanes were going unsold. Some projects of the employer were delayed or cancelled. The projects were to benefit the system user, the travel agent, and corporate clients. The claimant acknowledged that if the public were flying as much after 9–11 as [it was] before 9–11, there would have been no reduction in flights.

. . . .

The claimant's testimony establishes that it was the flying public's reluctance to fly and the reduction in the purchase of airline tickets that caused the reduction in flights. The claimant's employment was tied to the purchase of tickets by the public. Even on reduced schedules, airlines were flying at only 40% of capacity, leaving 60% of the seats unsold. There was clearly an inventory to be sold but the public wasn't buying. Based on this conclusion, the claimant's lack of work was not due to a reduction in service by a certified air carrier, but was due to the public's reluctance to fly.

C.

Claimant again appealed to the Panel. He argued, among other things, that (1) the statutory phrase "reductions in service by a certified air carrier" includes a reduction in booking and ticketing services; (2) the airlines provide those services through Galileo; (3) Galileo's online booking system suffered significant losses and reductions after September 11; and (4) his separation was due, at least in part, to Galileo's losses and reductions.

However, the record contains no evidence that Galileo reduced the booking and ticketing services it provides to its customers, only that the customers decreased their use of the available services.

The Panel concluded that the hearing officer considered claimant's evidence but was not persuaded that claimant's separation was due, even partially, to a reduction in service by an air carrier.

D.

The hearing officer's findings are logical. Although there was a reduction in flights, Galileo lost revenue and terminated claimant, not because there were fewer seats available to sell, but because fewer seats were being purchased.

Indeed, on this record it would have been illogical to find that because the airlines and Galileo both lost revenue as a result of the public's post-September 11 fear of flying,

travelers were buying fewer tickets because the airlines were providing fewer flights, because Galileo was performing less maintenance on its existing computer system, or because there was a reduction in the internet booking and ticketing services that were available to consumers. In fact, the hearing officer found that, even after the airlines reduced flights, seats remained available.

The hearing officer's findings explicitly resolve the factual question of whether claimant's separation was due to reductions in service provided by a certified air carrier. They are supported by substantial evidence, and this court is bound by them. Therefore, I perceive no basis upon which to require the hearing officer to reconsider that issue.

## II.

I also disagree with the majority's conclusion that the hearing officer and the Panel erred when they equated a reduction in service by an air carrier to a reduction in flights.

## A.

A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning. *Perrin v. United States,* 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979); *Harbert v. Healthcare Services Group, Inc.,* 391 F.3d 1140 (10th Cir.2004); *Fogg v. Macaluso,* 892 P.2d 271 (Colo.1995). We give deference to the interpretation given by the officer or agency charged with administering the statute. *El Paso County Bd. of Equalization v. Craddock,* 850 P.2d 702 (Colo.1993).

Although the term "service" can have different meanings in different contexts, in the context of air travel, the plain, ordinary, and common meaning of the specific phrase "service by an air carrier" is "flights." In contrast, when congress has intended to refer to airline activities other than flights, it has used the plural term, "services." *See, e.g., Arapahoe County Pub. Airport Auth. v. Centennial Express Airlines, Inc.,* 956 P.2d 587, 593 (Colo.1998).

According to testimony at the hearing and an attachment to the department's brief to the hearing officer, the department received from the U.S. Department of Labor (DOL) a message that contained additional questions and answers regarding the TEUC–A program. The email message explained that there must be a connection between an individual's separation and "a reduction in service by the air carrier (i.e., less flights, no need for the individual's services)." The hearing officer's and the Panel's application of the phrase "service by an air carrier" is consistent with that of the DOL and the department.

Therefore, based on the plain and ordinary meaning of the term "airline service," and deferring to the federal and state agencies charged with applying the statute, I conclude that, in the context of this statute, "service by an air carrier" means "flights by an air carrier."

Consequently, I would affirm.