THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. JAMES BASSONE, PLAINTIFF IN ERROR.

Argued February 11, 1932—Decided May 16, 1932.

For the plaintiff in error, *Samuel J. Kessler.*

For the defendant in error, *Joseph L. Smith,* prosecutor of the pleas; *Joseph E. Conlon,* first assistant prosecutor of the pleas, and *Harold H. Fisher,* special assistant prosecutor of the pleas.

The opinion of the court was delivered by

TRENCHARD, J. James Bassone was convicted of murder in the second degree in the Essex County Court of Oyer and Terminer on an indictment charging him with the murder of James La Morte on July 8th, 1928. He brings up the entire record and specifies causes for reversal, and also assigns errors on exceptions.

The state's evidence at the trial tended to prove the following matters of fact: The defendant was an operator of cafes, night clubs and poolrooms. In July, 1928, he owned and operated a so-called lunchroom at 10 Indiana street, Vaux Hall, and employed Helen Stokes as manager. Shortly after midnight in the early morning of July 8th, 1928, while several men and women were in the place, Salvatore Conforti and the decedent, James La Morte (also known as "Garcia"), armed with guns, entered and "held up" the place, searching those present and robbing some of them, taking, among other things, $500 belonging to the place from the custody of Miss Stokes, the manager. Among those present was one Sena and his friend Ceglia. The robbers merely pretended to search Sena but did not rob him. Miss Stokes knew and recognized La Morte, one of the robbers. After the robbers had departed in their automobile, Miss Stokes, about two A. M., telephoned the defendant, Bassone, and told him of the occurrence. The defendant thereupon went to Vaux Hall, and was informed by Miss Stokes of La Morte's participation in the robbery, and of Sena's presence. The latter had left the place and had gone to Ceglia's home. Sena left Ceglia's home about four-thirty A. M., and went to his own home, apartment 17, at 635 High street, Newark. Meanwhile, La Morte and Conforti, the robbers, met the witness Anthony Boscaino, and had the latter drive them to Sena's apartment at 635 High street. Boscaino was also accompanied by a man referred to by him as "Mike" but otherwise unidentified. Boscaino drove a roadster with a rumble seat. Boscaino and "Mike" sat in the front seat and La Morte and Conforti sat in the rumble seat. They arrived at the apartment at about six-thirty A. M. Sena was then in bed. Mrs. Sena opened

the door and let La Morte and Conforti in. She knew one of them. They went immediately to the bedroom where Sena was in bed. About five minutes later the bell rang again. Mrs. Sena went to the door and inquired "who's there?" The person did not answer. After waiting a while, speculating as to who it might be, she started to open the door; as she did so, the defendant Bassone passed her and went directly to the bedroom. She went to the bathroom. Then she heard two shots, and saw the defendant leave the apartment. She went into the bedroom and saw La Morte and Conforti lying on the floor, wounded, and her husband, Sena, just getting out of bed. Then Sena went to the street and notified Boscaino that La Morte and Conforti had been shot. Boscaino then telephoned the city hospital. As Sena came from the apartment and crossed the street to Boscaino's car, he was seen and watched by Charles Streiter, a milkman. Sena had nothing in his hand and gave nothing to Boscaino, and threw nothing in the car. Then Sena came to Streiter for assistance. Streiter went to the apartment with Sena. Soon the police and ambulance came. Streiter saw Sena come out of the apartment a second time, with a package in his hands. Sena took the package to the basement. Streiter and the police found it in the ashcan. That bag contained nothing but an opium smoking outfit. No gun was found in the apartment, nor upon Sena, nor upon either of the wounded men. Both bullets, the one that killed La Morte, as well as the one that killed Conforti, were fired from the same gun. Immediately after leaving the apartment the defendant fled to distant parts where he remained in hiding until arrested several months later.

Such were the matters of fact which the jury, if they saw fit, could and no doubt did find.

The defendant gave various versions of the affair at different times. At the trial he testified that early in the morning of July 8th, he received a telephone call from Helen Stokes advising him of the robbery; that he advised her to go to bed and that he would see her in the morning; that about daylight the same day he received another telephone

call advising him to go to Sena's apartment on High street for information concerning the robbery; that he immediately got up, dressed and drove to Sena's apartment in his Cadillac automobile; that Mrs. Sena opened the door, and he went past her to the bedroom where Sena way lying; that he was unarmed; that as he entered the room he asked if Sena wanted to see him; that thereupon either La Morte or Conforti, who were in the room, demanded that he take off his diamond ring; that a gun was pointed at him by one of the two, being about a foot away from him on his left; that he caught this person's hand and pushed him around, the other was facing him; that as he, the defendant, pushed this person's arm away, both guns (La Morte's and Conforti's) went off and defendant immediately left, got in his car and went immediately to Middletown, New York, because he was afraid of the "gang;" that he stayed there awhile and then he went to South Norwalk, Connecticut, where he lived under the alias Frank Romano, and from there he went to Yonkers, New York, where he lived for several months until he was arrested.

The witness Sena called by the defendant, and the witness Boscaino called by the state, testified to matters which if believed, would tend to weaken the state's contention as to some of the pertinent facts, but the testimony of both was impeached by proof of contradictory statements made out of court.

Taking the whole case, and without particular reference to evidence tending to discredit the testimony of the defendant, it is sufficient to say that the evidence demonstrates (1) that there was no error in the refusal of the trial judge to direct an acquittal at the close of the state's case, and (2) that the verdict was not against the weight of the evidence.

The refusal at the close of the state's case to discharge a defendant in a criminal trial, although reviewable on error when the proceedings had at the trial are brought up pursuant to sections 136 and 137 of the Criminal Procedure act (*Comp. Stat.*, *p.* 1863), will only justify a reversal of the conviction when there were no facts proper to be submitted

to the jury which would support the conclusion of guilt. *State* v. *Engsberg,* 94 *N. J. L.* 464; *State* v. *Lieberman,* 80 *Id.* 506; *affirmed,* 82 *Id.* 748.

To justify the reversal of a judgment in a criminal case on the ground that the verdict is against the weight of the evidence, it must be so clearly so as to give rise to an inference that it was the result of mistake, passion or prejudice. *State* v. *Grace,* 98 *N. J. L.* 341.

The defendant next argues that the trial court erred in refusing to allow the witness Sena, to be cross-examined as to whether or not he had seen the decedent or the defendant at any other place after the hold-up in Vaux Hall.

But this argument has no proper assignment of error or cause for reversal to support it, in view of the rule that in criminal cases brought up by writ of error, whether on bills of exceptions or under sections 136 and 137 of the Criminal Procedure act, or both, the assignments of error and causes for reversal should specifically point out the judicial action complained of. *State* v. *Blaine,* 104 *N. J. L.* 325. But apart from that our examination of the entire record discloses that the questions excluded were not within the proper scope of cross-examination.

The defendant next contends that the judgment should be reversed "because the trial judge erred in permitting the prosecutor to plead surprise during the direct examination of the witness Boscaino, and permitting the prosecutor to cross-examine him in an attempt to impeach his testimony."

We think the contention is ill-founded. The rule is that where a party is surprised by adverse testimony of a witness called by him, the trial court may in the exercise of its sound discretion, permit him to offer proof of self-contradictory statements previously made by such witness for the purpose, not of proving the truth of such statements, but to discredit or neutralize the effect of such adverse testimony. *State* v. *D'Adame,* 84 *N. J. L.* 386. We think it appeared that the prosecutor of the pleas was surprised by the adverse testimony of this witness, and that the testimony in question was properly admitted under the rule stated; and we may add that

the trial court very properly limited the effect of such proof to the purpose stated in the rule.

It is next said that the trial court erroneously permitted the defendant to be asked why he had refused to make a statement before he had seen his counsel.

Not so. The defendant on his direct examination was asked by his counsel if he did not demand to see his counsel before he would speak to Captain Sebolt of the Newark police, and he answered that he did. We think it was within the discretion of the trial judge to permit the defendant to be asked on cross-examination why he had made that demand.

It is next said that the trial court erred in permitting the prosecutor of the pleas to ask the witness Helen Stokes questions concerning the character of the rooms on the second floor of the house at Vaux Hall.

We think not. The premises were rented and occupied by the defendant under the management of Helen Stokes. A robbery was committed, which was drawn to the attention of the defendant by Helen Stokes, and that was a relevant matter for investigation for the purpose of showing motive for the killing. We believe it was proper for the state to ask these questions: "How many rooms are there on that second floor?" and "what were those rooms?" But if that be not so, still the defendant cannot complain. There was no objection to the first question, and the rule is that a question put to a witness and answered without objection is no ground for reversal, whether the review is by strict writ of error or under sections 136 and 137 of the Criminal Procedure act. *State* v. *Garton,* 102 *N. J. L.* 318. The other question was not answered, and the rule is that a question put to a witness which was not answered is no ground for reversal.

The next point is that the court erroneously admitted in evidence a prior contradictory statement of the witness Sena, a witness called by the defendant to corroborate the defendant's version of the occurrence in the Sena apartment.

We think that the action of the trial judge was well within the rule and not erroneous.

The rule is, that where a witness upon his cross-examination is asked if he has not made a statement out of court incon-

sistent with or contradictory of his testimony, relevant and material to the issue, on his direct examination, and his attention is clearly directed to all the circumstances of time, place and person under which the contradictory statement was made, then, if he does not admit that upon the particular occasion designated he made the statement, it may be proved that he did in fact make it.

It is next said that the judgment should be reversed because the trial judge refused to admit proof of prior convictions of crime by decedent in order to show decedent's "dangerous and vicious" character.

We think not. Where, as here, the fact that the decedent was a dangerous and blood-thirsty man has already been established at the trial and is not disputed, the refusal of the trial judge to admit additional proof to that effect is not error justifying reversal of the conviction. *Whart. Hom.* 425, ¶ 258. That the undisputed character of the decedent had already been clearly established at the trial is shown by the admission in the defendant's brief that "it had already been proven that the deceased was a gangster and a gunman, and had committed a hold-up on the night in question."

It is next said that the court improperly admitted in evidence the bag containing certain opium pipes.

But that was not erroneous. It was relevant for the state to show that no gun had been removed from the room after the departure of the defendant immediately following the killing, and it was permissible for the state to prove that the bag, which had been removed from the room by another person immediately following the departure of the defendant, did not contain a gun.

It is next said that the judge erred in refusing to charge certain requests.

We think not. The 14th and 15th were properly refused because they assumed the existence of certain facts which had no basis in the evidence. *Spence* v. *Hutchinson,* 102 *N. J. L.* 131. Requests 19 and 20 were properly refused because they were erroneous in law. In so far as any of these requests were in part pertinent and proper they were amply covered

by that part of the charge which declared that: "If you find that Conforti and Garcia [La Morte] or either of them, has made threats against Bassone, whether such threats were made on the occasion of the shooting or before that occasion and even if Bassone did not know of these threats, you may take them into consideration in determining which of the parties was the aggressor, and who provoked the assault that led to the shooting, and in determining the guilt or innocence of the defendant on all the evidence in the case." *State* v. *Scaduto,* 74 *Id.* 289. Request No. 27 was properly refused because it asked the judge to declare, in effect, that the testimony of a witness (who happened to be a ballistic expert) "is not evidence of the facts" to which he testified, entirely part from his opinion evidence.

The defendant complains of the charge but upon examination we find no fault with it.

The only remaining question argued relates to the refusal of the judge to permit the witness Boscaino to testify to declarations made to him by others. We think they were properly excluded because clearly hearsay.

The judgment will be affirmed.

*For affirmance*—The Chief Justice, Trenchard, Parker, Campbell, Lloyd, Case, Bodine, Donges, Van Buskirk, Kays, Hetfield, Dear, Wells, Kerney, JJ. 14.

*For reversal*—None.