**UNITED STATES v. JOHNSON.**

No. 7795.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 21, 1941.

Decided June 30, 1942.

Benjamin M. Golder, of Philadelphia, Pa. (John Rauffenbart, of Atlantic City, N. J., and Walter G. Winne, of Hackensack, N. J., on the brief), for appellant.

Joseph W. Burns, Sp. Asst. U. S. Atty., of Washington, D. C. (Charles M. Phillips, U. S. Atty., of Trenton, N. J., Gordon B. Tweedy, Earl C. Crouter, and Robert R. Barrett, Attys., Department of Justice, both of Washington, D. C., on the brief), for the United States.

Before BIGGS, JONES, and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

### Facts.

The appellant was indicted upon an indictment consisting of three counts. Each count charged an offense against Section 145(b) of the Revenue Act of 1936, Act of June 22, 1936, c. 690, 49 Stat. 1648, 26 U.S.C.A. Int.Rev.Code, § 145(b), which provides in part that "* * * any person who willfully attempts in any manner to evade or defeat any tax imposed by this title [chapter] or the payment thereof, shall, * * * be guilty of a felony * * *". The appellant was charged respectively in the three counts with wilfully evading payment of income tax for the years 1935, 1936 and 1937. He was ac-

quitted under the first count, was found guilty and was sentenced on each of the two remaining counts.

The second count alleges that Johnson filed an income tax return for the year 1936 reporting a gross income of $29,-958.19, but omitted the sum of $62,400 received from backers of numbers games. The count charges that the defendant attempted thereby to evade taxes in the amount of $19,957.30. The third count alleges that the appellant reported a gross income of $33,740.28 for the year 1937 but omitted the sum of $62,400 received by him from numbers backers. The count charges that he attempted thereby to evade taxes amounting to $18,759.10.

The facts are as follows. The appellant was a political leader in Atlantic County, New Jersey, residing in Atlantic City. He testified that he had occupied the position of county treasurer for many years but had devoted his time to politics. The evidence showed that in the latter part of 1932 or at the beginning of 1933 there were seven numbers banks or games operating in Atlantic City. Six of these banks operated in the daytime; one operated at night. These banks paid protection money to the appellant at the rate of $825 a week for approximately the first six months of 1935. About April 1935, Ralph Weloff and James Towhey, numbers backers, fell into a dispute. One Martin Michael, sometimes known as Jack Southern, ousted Weloff as Towhey's partner and took over the latter's numbers bank himself. Towhey tried to get the business back by giving higher odds on numbers, by cutting fewer numbers and by paying higher commissions to salesmen and runners. This precipitated a numbers war in Atlantic City. All the backers lost money, the struggle between them became "noisy" and attracted public attention. Arrests increased and business was lost. As a result all the numbers backers held a meeting and formed a single large partnership or syndicate into which they pooled their business. The syndicate was set up and began to function about July 1935. Its operations were highly successful.

This syndicate paid Johnson $1,200 a week. The payments began in July 1935, continued throughout the balance of that year, throughout 1936, and through at least the first ten months of 1937. The sums upon which the United States al-

leged the appellant had not paid income taxes for the years 1935, 1936 and 1937, are made up by the yearly totals of these weekly amounts.

Johnson stated the sums paid to him were not paid for the protection of the numbers bankers from police interference but in order to enable him to maintain his personal political machine; that he kept for himself the balance of the sums paid to him weekly after deducting therefrom certain political expenses; that the amounts of these deductions were set forth on slips which he sent to his office. He testified that when he made his tax returns for the taxable years with which we are concerned he reported as taxable the difference between the amounts received and the amounts paid out, designating the sums retained by him as "commissions" or as "other commissions". Johnson also stated that he considered the sums deducted as properly deducted and that he had no intention of evading taxation.

Throughout Johnson's examination-in-chief his counsel carefully restricted his questions and Johnson restricted his answers so that neither questions nor answers embraced the months of November and December, 1937. Ralph Weloff, the paymaster for the numbers syndicate, was asked how long he continued "to take $1200 a week to Johnson?" In reply he stated his recollection "after talking it over with some of the backers and another man Jack Sothern who had established a different time, established a time in November, 1937 * * * that November 1937 was the right time."; viz., the time when he, Weloff, had ceased to take money to Johnson. Weloff's duties as paymaster for the numbers syndicate were assumed at about this time by Martin Michael, known also as Jack Southern. This person, whom neither side was willing to bring to the stand as a witness, was called by the presiding judge. His testimony was that he had paid no money to Johnson at any time.

Upon cross-examination and over objection the defendant was questioned as to how long he had kept up the practice which he had described in regard to the slips which he sent to his office. To this he replied, "During this period * * * '35, '36 and '37." Thereupon he was asked, again over objection, as to whether he continued to send slips to his office in the year 1938. He replied that he did do so throughout that year. An objection to a question as to what he did in this regard in 1939 was sustained as too remote. There followed a series of questions directed to the receipt of money and the keeping of records by Johnson in the years 1934 and 1936. Then occurred the following illuminating colloquy. Johnson was asked by government counsel, "How about 1937. Did you record $1200 weekly each week in 1937?" His counsel interjected: "Until November 1st." The counsel for the United States then said, "Now, that is the part I object to." The court's comment to Johnson's attorney was, "You are out of order on that. The objection is overruled. You are not answering for the witness. He is answering for himself." The defendant's counsel stated, "I am sorry, your Honor." The court said, "You might take your seat and permit the examination to continue." The cross-examination continued, Johnson admitting that he had received money from Weloff "Up until the time Mr. Weloff stopped receiving the money." Then Johnson was asked, "Didn't you get that $1200 every week right up until the end of the year?" He replied, "No, sir." The next question was, "Didn't Jack Southern bring that money to you after Weloff stopped?" Johnson again replied, "No, sir." The next day Johnson was asked, "Did you receive any money from numbers in 1938?"[1] The defendant's counsel objected but the objection was overruled. Johnson replied, "Yes, sir." He was then asked, "Who gave it to you?" His counsel then stated, "I object to that, if your Honor please. I think perhaps we should have argument upon this question because I can see what it is opening up if it is allowed to proceed. I think it is highly objectionable to inquire into a situation which, according to public newspaper articles is going to be the subject of another indictment against this defendant, quoting Mr. Burns. I think the defendant is entitled to be protected." The trial judge said that he desired argument upon the point raised and counsel for the defendant suggested that the jury be excused during the argument. The court thereupon excused the jury which withdrew from the courtroom. The prosecuting attorney then

[1] Transcript pp. 736, 871, 875, 1503– 1504a, 1506–1507.

said, "* * * as long as the jury has left the room and is not present I am going to ask that the defendant also be excused from the courtroom during the argument and that when he resumes the stand he should do so without having any opportunity to hear what the argument is about and I suggest that he remain in the outer office of the chambers of Judge Avis during the argument." The court then said, "I think that is a fair request. You may retire, Mr. Johnson." While what Johnson did then is not described in detail in the record, the record does state that "the defendant withdrew". It is entirely clear from the ensuing colloquy of court and counsel that the defendant did not return to the courtroom until the jury was called back. This is also implicit in the briefs. During the course of the argument before the defendant returned to the courtroom, his counsel stated, "* * * I want to say that regardless of whether I am right in any of my other contentions * * * it [the question asked of the appellant, viz., "Who gave it to you?"] is an attempt on the part of the government to force from the witness who is not immune from testifying as to things which are on trial here before the court, but who has the same immunity as any one else from testifying from any other thing than that which is on trial before the court, [sic] that this is an improper cross examination for the reason that it is directed to a future prosecution." After further argument the trial judge stated, "You may advise him of his rights, of course, but it is for him to determine whether or not he wishes to take advantage of them * * *". Further argument took place and the trial judge finally said to counsel for the defendant, "I will allow you an exception. I will permit you, after the question is asked, to advise him about his rights." The right to which the trial court and the appellant's counsel referred was the appellant's right under the Fifth Amendment not to be compelled to give testimony against himself.

When the jury was called back the defendant resumed the witness stand. The question, "Who gave it to you?" was repeated to him. The defendant was informed of his constitutional rights by his counsel and immediately he claimed a right not to answer the question. He was also asked, "What fund did you use during November and December of 1937 to pay these expenses that you had been paying out of this fund?" The witness answered, "Money that had been accumulated." He was then asked, "What money did you use in 1938 for that purpose?" The witness declined to answer the question, again purportedly taking advantage of his constitutional rights. The prosecuting attorney then showed Johnson an exhibit which was his income tax return for the year 1938 and the defendant was asked to identify the document. Again his counsel objected, but the objection was overruled. The defendant replied, "My income tax return for 1938". He was then asked "* * * did you have an item of 'other commissions' for the year 1938 as part of your income?" The defendant again claimed privilege. Then came a question: "What money did that represent?" Johnson replied, "I refuse to answer on the grounds that I do not have my records here, and on my rights under the Constitution." The court then said to him, "You may decline to answer upon the ground that it might tend to incriminate you, not upon the ground that you do not have your records here. You might say that you do not know if that is a fact." Johnson replied, "All right; I refuse to answer as it tends to incriminate me." This was the end of this line of cross examination.

### The Law.

Did the Court Commit Reversible Error by Excluding Johnson from the Courtroom?

The Fifth Amendment to the Constitution of the United States provides that no person shall be deprived of liberty without due process of law and the Sixth Amendment guarantees a speedy and public trial with the right of confrontation[2] to every defendant in the courts of the United States.

---

[2] The Sixth Amendment to the Constitution of the United States provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defence."

The leading criminal case on what constitutes due process under the Fourteenth Amendment is Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674, 90 A.L.R. 575. We think that this decision must guide us to our conclusion in the case at bar since the Supreme Court held in Hurtado v. People of California, 110 U.S. 516, 535, 4 S.Ct. 292, 28 L.Ed. 232, that the phrase "due process of law" used in the Fourteenth Amendment to restrain action by the states means substantially the same as that phrase of the Fifth Amendment, restraining action by the federal government. See, also, Twining v. New Jersey, 211 U.S. 78, 101, 29 S.Ct. 14, 53 L.Ed. 97; Powell v. Alabama, 287 U.S. 45, 66, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; Chambers v. Florida, 309 U.S. 227, 235, 236, 60 S.Ct. 472, 84 L.Ed. 716, and compare Grosjean v. American Press Co., 297 U.S. 233, 245, 56 S.Ct. 444, 80 L.Ed. 660. In view of the exhaustive citation of authorities in both the majority opinion of the Supreme Court by Mr. Justice Cardozo and in the dissenting opinion of Mr. Justice Roberts in the Snyder case, there is no point in this court embarking upon a lengthy reiteration of the authorities.

In Snyder v. Massachusetts, Snyder, who had been found guilty of a murder growing out of an attempted robbery, contended that he had been deprived of due process of law under the Fourteenth Amendment because when the jury had viewed the scene of the crime pursuant to the provisions of Section 35 of Chapter 234 of the General Laws of Massachusetts he had not been present. The Supreme Judicial Court of Massachusetts affirmed the conviction, 282 Mass. 401, 185 N.E. 376, and the Supreme Court of the United States refused to reverse the judgment of the Supreme Judicial Court of Massachusetts.

After referring to Twining v. New Jersey, supra, 211 U.S. at pages 106, 111, 112, 29 S.Ct. 14, 53 L.Ed. 97, in which the privilege against self-incrimination was withdrawn, and Hurtado v. People of California, supra, where a defendant was tried for a capital offense upon an information rather than an indictment, Mr. Justice Cardozo stated the essence of due process of law as follows, 291 U.S. at page 105, 54 S.Ct. at page 332, 78 L.Ed. 674, 90 A.L.R. 575, "What may not be taken away is notice of the charge and an adequate opportunity to be heard in defense of it." Mr. Justice Cardozo then went on to say that a defendant's privilege to confront his accusers and cross-examine them face to face is guaranteed to him by the Sixth Amendment in prosecutions in the federal courts, citing Gaines v. Washington, 277 U.S. 81, 85, 48 S.Ct. 468, 72 L.Ed. 793, and that his defense may be made easier if he is permitted to be present while jurors are being examined or counsel are summing up to the jury. His presence will enable him to advise his counsel or if he wishes, to supersede his counsel and to conduct the trial himself. Mr. Justice Cardozo then went on to say, "In all the cases thus assumed the presence of the defendant satisfies the test that was put forward a moment ago as basic and decisive. It bears, or may fairly be assumed to bear, a relation, reasonably substantial, to his opportunity to defend." The test thus laid down by the Supreme Court is a very plain one. In the opinion in the Snyder case Mr. Justice Cardozo also stated, 291 U.S. at pages 107, 108, 54 S.Ct. at page 333, 78 L.Ed. 674, 90 A.L.R. 575, "So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." The Supreme Court points out that motions before trial are heard in the defendant's absence, as are many motions made after trial or in the prosecution of appeals.

The question which we have before us in the instant case is one which is extremely difficult to answer. Obviously it is not necessary for a defendant to be present at every stage of the proceedings against him. Due process does not require him to be in court when a true bill is returned against him by a grand jury or when his appeal is argued in the appellate court. See Dowdell v. United States, 221 U.S. 325, 331, 31 S.Ct. 590, 55 L.Ed. 753. The defendant must be in court when jurors are challenged. Hopt v. People of Utah, 110 U.S. 574, 579, 4 S.Ct. 202, 28 L.Ed. 262. Certainly the defendant must be present when the jury is in the box and the trial is in progress. The defendant must be deemed to have the absolute right to hear everything which the jury hears if he is to protect himself. Under such circumstances his presence bears a relation "reasonably substantial, to his opportunity to defend". To exclude him from the court room upon such occasions would be to hazard his constitutional rights upon the theory an appellate tribunal might save him from jeopardy. He must be present when the jury is present and is receiving evidence. If he is, then the trial meets the substance of

the stringent test laid down by Mr. Justice Roberts in his dissenting opinion in the Snyder case, 291 U.S. at page 129, 54 S.Ct. at page 341, 78 L.Ed. 674, 90 A.L.R. 575. Mr. Justice Roberts stated that the prisoner's constitutional right of presence " * * * comprehend[s] the inquiry by the ordained trier of fact from beginning to end", citing Hopt v. Utah, supra; Lewis v. United States, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011, and Diaz v. United States, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500, Ann.Cas. 1913C, 1138. In the instant case it appears that the defendant was present at all times that the jury was present and his absolute constitutional right of presence was not infringed.

■ Johnson's exclusion took place when the jury was absent and a point of law raised by his counsel was argued. We can find no federal decision precisely in point. The case which supplies the nearest parallel to the case at bar is that of Adams v. State of Florida, 28 Fla. 511, 10 So. 106, 117, where the jury had been sent from the courtroom during argument and Adams was returned to jail. In that case it was flatly held that the defendant had, " * * * the right to be present and to hear questions of law as well as questions of fact discussed, and in fact no steps can be taken in the case in his absence." A somewhat similar decision was reached in Tiller v. State, 96 Ga. 430, 23 S.E. 825, 826. In this case Mr. Justice Lumpkin stated, "It cannot be doubted that the argument of counsel is a stage of the proceedings, for the trial is not concluded until after the verdict has been received and recorded. The importance of this particular stage, as affecting the accused, is obvious; it being a matter of vital concern to him to see and hear everything done and said, both for and against him, as the trial progresses."

The decisions just cited seem to us to go too far. If followed to their logical end great difficulties would be encountered in the practical conduct of a trial. The rule was stated by Mr. Justice Cardozo in the Snyder case, 291 U.S. at page 114, 54 S.Ct. at page 335, 78 L.Ed. 674, 90 A.L.R. 575, as follows, "A defendant in a criminal case must be present at a trial when evidence is offered, for the opportunity must be his to advise with his counsel * * * and cross-examine his accusers", citing Powell v. Alabama, supra; Dowdell v. United States, supra; Commonwealth v. Slavski, 245 Mass. 405, 140 N.E. 465, 29 A.L.R. 281. In other words, applying another test stated by Mr. Justice Cardozo, the presence of a defendant is a condition of due process only "to the extent that a fair and just hearing would be thwarted by his absence * * *." The test, therefore, the jury, the triers of fact being absent from the courtroom, must be whether or not the appellant was damaged by not being present. An examination of the record convinces us that he was not. The question which was argued was purely one of law. We think that the trial court correctly resolved it for the reasons which will appear more particularly hereafter. Upon the return of the appellant to the courtroom he was warned of his constitutional immunity and claimed it immediately. As we have previously indicated, the right of a defendant to be present when the triers of fact are absent is not an absolute right, but one qualified by a condition that nothing occurs when he is not present which could put him in jeopardy. Only thus would his presence bear a relation "reasonably substantial, to his opportunity to defend."

■ Counsel for the United States makes much of the fact that when the appellant went on the stand he acquired another capacity; he remained a defendant but he became a witness. A defendant who becomes a witness waives his constitutional privilege against self-incrimination as to the crime with which he is charged. Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054. Waiver of privilege by a defendant is discussed at length in 8 Wigmore on Evidence, 3rd Ed., §§ 2276 et seq. and we do not need to repeat here what is said there. The government contends that when Johnson offered himself as a witness he waived any constitutional privilege which conflicted with that role. We cannot agree with this contention. There is ample authority for the proposition that a defendant when he goes on the witness stand waives constitutional rights otherwise retained. For example, he waives his privilege as to self-incrimination. He must answer questions as to facts according to the rules which are imposed on him in the jurisdiction in which he is being tried. There are half a dozen different rules which may govern the giving of his testimony. They need not be stated here. See Wigmore on Evidence, supra. But in the case at bar we are not concerned with what testimony a defendant who takes the stand must give but with the fact that the defendant was absent from the court room at a stage of his trial. We cannot

justify the exclusion of the defendant from the courtroom in the case at bar on the ground that he was a witness. For whatever additional capacity or capacities a defendant may acquire during the course of his trial he remains a defendant throughout the entire course of his trial until, the jury returning a verdict of not guilty, the court has entered judgment upon that verdict. The argument of the prosecuting officer based upon the appellant's capacity as a witness is an ingenious one, but we cannot accept it. Its acceptance would open the door wide to abuse and the abrogation of rights guaranteed by the Fifth and Sixth Amendments to the Constitution of the United States.

We prefer to base our conclusions on what we deem to be safer ground. We lay down the rule for this circuit that a defendant must be present in the courtroom at every stage of the proceeding which requires the presence of the jury. This is an absolute right. He should also be present at every other stage of his trial, from the time the first venireman is called to the box until judgment is rendered by the court upon the verdict of the jury. If he is not present when the triers of the facts are not present but argument is being had before the court during the course of his trial, he must be deemed to be entitled to a new trial if it be found that any of his rights have been endamaged by his absence.

In the case at bar it should be noted that neither the defendant nor his counsel made objection to the direction of the trial judge that he leave the courtroom during the argument upon the propriety of the question which had been put to him as a witness. The record is full of other instances of vigorous objection by the defendant's counsel. We think that the defendant acquiesced in the trial judge's direction to him to withdraw from the courtroom. No objection was made at the time the trial judge gave the direction. It was not made the basis for any motion following the judgment of conviction. It was not advanced to this court as a ground for the enlargement of Johnson upon bail. It was asserted first in the argument upon appeal. We state these facts despite our conviction that in the application of constitutional rights technicalities have no place, for we think the facts tend to confirm our conclusion that the defendant took no harm from his exclusion from the courtroom during the argument.

## Did the Trial Court Err in Permitting Questions and Evidence as to Money Received by the Appellant in 1938?

We have set out some of the questions and answers pertinent to this inquiry in our discussion of the first point. We need not reiterate them now.

The question of whether or not Johnson had received money from the numbers backers in the last two months of 1937 was pertinent to the issues presented by the indictment in the case. As we have stated Martin Michael, sometimes known as Jack Southern, had testified that he paid no money to Johnson after he, Michael, took over the office of paymaster for protection of the numbers banks. Johnson on cross-examination asserted that he had received no money from the numbers backers in the latter part of the year 1937. Thereafter on cross-examination, as we have already indicated, he was asked whether he had received money from the numbers backers in 1938 and admitted that he had done so.

■ We can perceive no error in questioning the defendant in detail as to what he did with respect to his income tax return for the year 1937, whether he received money in 1938 from the numbers game, from whom he received it, and what he did with it. These questions properly were designed to test the credibility of the defendant's original statement that he did not receive money from the numbers backers in the last two months of 1937 for it places some strain upon credulity to suppose that the payments made to him for protection over a period of years were suddenly halted for two months within the time covered by the indictment only to be resumed by Johnson's own admission immediately thereafter. As a matter of fact, upon cross-examination, Johnson had already testified, without any objection from his counsel, " * * * when I got ready to send every month or few months, I would send memorandums up showing what my net income was during that period; they would be filed until I made up my income tax." Further cross-examination as to the duration of this practice within the time limits of the indictment was entirely proper. This was recognized by defendant's counsel in his objection to the question, "And how long did you keep up that practice?" Johnson's counsel in explaining his objection to that question stated, "I want to urge that nothing after the date, the end of 1937 is admissible * * *."

The incongruity between the admission by Johnson of his continuing to send slips from which his income tax returns were made up to his office throughout the whole of 1937 and the testimony as to the alleged non-delivery of money to him during the last two months of that year is manifest. It throws into sharp relief the issue of Johnson's credibility which the questions of the cross-examiner were designed to test.

An examination of the transcript also discloses the whole extraordinary story told by the appellant to the effect that $1,200 was delivered to him weekly; that he kept slips showing the net sums remaining in his hands after he had deducted the expenses of his personal political machine and that he returned the balance in 1935, 1936 and 1937 as "commissions" or "other commissions". The appellant was in fact testifying to a system which he said he pursued in making up his income tax returns. He gave this information in the course of his examination-in-chief by his own counsel. It was perfectly proper in our opinion to permit cross-examination within reasonable limits as to the system pursued by him in years prior and subsequent to the taxable years in question. This also constituted a proper test of the appellant's credibility. See Bonness v. United States, 9 Cir., 20 F.2d 754; Tinkoff v. United States, 7 Cir., 86 F.2d 868, certiorari denied 301 U.S. 689, 57 S.Ct. 795, 81 L.Ed. 1346; United States v. Dalhover, 7 Cir., 96 F.2d 355; Cravens v. United States, 8 Cir., 62 F.2d 261, certiorari denied 289 U.S. 733, 53 S.Ct. 594, 77 L.Ed. 1481; Alderman v. United States, 5 Cir., 31 F.2d 499, certiorari denied 279 U.S. 869, 49 S.Ct. 515, 73 L.Ed. 1006; and Madden v. United States, 9 Cir., 20 F.2d 289.[3] We cannot conclude that the trial court erred in the exercise of its discretion in permitting the cross-examination here in issue. Gowling v. United States, 6 Cir., 64 F.2d 796; Silverman v. United States, 1 Cir., 59 F.2d 636, certiorari denied 287 U.S. 640, 53 S.Ct. 89, 77 L.Ed. 554; Hewitt v. United States, 8 Cir., 110 F.2d 1, certiorari denied 310 U.S. 641, 60 S.Ct. 1089, 84 L.Ed. 1409. Compare United States v. Reed, 2 Cir., 96 F.2d 785, certiorari denied 305 U.S. 612, 59 S.Ct. 71, 83 L.Ed. 399; United States v. Waldon, 7 Cir., 114 F.2d 982, certiorari denied 312 U.S. 681, 61 S.Ct. 549, 85 L.Ed. 1119.

But quite apart from the foregoing, the witness answered but three questions over objection; as to the others he claimed his privilege against self-incrimination. The learned trial judge probably erred in Johnson's favor in allowing him to claim his privilege to avoid testifying upon material issues when he had submitted himself as a witness. But this worked in Johnson's favor. The fact that he claimed privilege cannot be deemed to have prejudiced him. There is no authority for holding that because a defendant in his capacity as a witness claims his constitutional privilege against self-incrimination that he is prejudiced thereby. In Raffel v. United States, supra, 271 U.S. at page 497, 46 S.Ct. at page 568, 70 L.Ed. 1054, the Supreme Court stated that when a defendant takes the stand in his own behalf " * * * he does so as any other witness, and within the limits of the appropriate rules he may be cross-examined as to the facts in issue. * * * His waiver is not partial; having once cast aside the cloak of immunity, he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing." The privilege has been described as " * * * an option of refusal, not a prohibition of inquiry." 8 Wigmore on Evidence, 3rd Ed., § 2268, p. 388. See,

---

[3] It should be noted that the common law of New Jersey as it existed prior to the enactment of the Judiciary Act of 1789, 1 Stat. 73, is not controlling here. Wolfle v. United States, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617; Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, 93 A.L.R. 1136; Note (1934) 47 Harv.L.Rev. 853. The New Jersey decisions are to the same effect, however. State v. Barth, Err. & App., 114 N.J.L. 112, 176 A. 183; State v. Von Der Linden, 105 N.J.L. 618, 147 A. 636; State v. Grover, Sup., 104 N.J.L. 10, 139 A. 417; State v. Bassone, Err. & App., 109 N.J.L. 176, 160 A. 391; State v. Suth-erland, Sup., 123 N.J.L. 513, 9 A.2d 807, affirmed on opinion below, Err. & App., 125 N.J.L. 273, 15 A.2d 749.

See, also, the recent decision of this court in United States v. Montgomery, 3 Cir., 126 F.2d 151, certiorari denied 62 S.Ct. 1268, 86 L.Ed. ——. We stated, 126 F.2d at page 155, "It may therefore be taken as the rule that in the trial of criminal cases federal courts are bound by such rules of procedure and evidence as Congress prescribes and such further rules as the federal courts have adopted or from time to time may adopt in the light of general authority and sound reason."

also, O'Connell v. United States, 2 Cir., 40 F.2d 201, certiorari dismissed 296 U.S. 667, 51 S.Ct. 658, 75 L.Ed. 1472.

That the defendant would have incriminated himself by answering the questions which were asked him was extremely unlikely. The trial judge applied the privilege very liberally in his behalf. But in any event Johnson gave no answer to any question which might have incriminated him and therefore he has taken no hurt. We conclude that no further discussion is necessary upon this point.

### As to Argument by the Prosecuting Attorney and the Sufficiency of the Court's Charge.

In arguing to the jury the prosecuting attorney stated, "Now, ladies and gentlemen, can you believe that man [the defendant] told you the truth about anything on the witness stand when he admits that he got numbers money in 1938 but won't tell you who he got it from on the ground that it would incriminate him? If you can believe that that man is innocent of this charge when he stands right up in front of you and says he cannot answer a question about 1938, that he just got through answering for 1937 on the ground it would incriminate him, well, then, I just don't get it." The court in his charge to the jury, after objection by the appellant's counsel, stated the following, "Mr. Burns also referred to the fact that Mr. Johnson in cross-examination when asked with regard to whom he received numbers money from in 1938, claimed his constitutional privilege of not being required to answer a question which he felt might tend to incriminate him. Now, that may only be considered by you in testing his credibility as to the answers which he did give and his good faith in the matter. We are not trying Mr. Johnson for anything that he did in 1938, that is not before you, that is an entirely different matter with which you or I have not any concern whatever. We are only considering in this case the years 1935, 1936 and 1937. In so far as any suggestion was made by Mr. Burns that that might be considered for any other purpose, you should disregard it." The appellant takes the position that the trial judge in stating this interpretation of the applicable law did not correct the prosecuting attorney's error, but rather accentuated it. The appellant contends that the trial judge in effect stated that when the appellant claimed his constitutional privilege that might be considered by the jury in testing his credibility in regard to the answers which he did give. This is really what the trial judge charged.

Was the trial judge in error in charging the jury that in testing the appellant's credibility and good faith it might consider the fact that he refused to answer questions in regard to the year 1938 upon the ground that to do so would incriminate him? We can perceive no reason why the fact that a defendant refuses to answer pertinent and proper questions upon cross-examination should not be considered by the jury in testing his good faith and credibility. Certainly the implication that the jury may consider the defendant's refusal to answer questions upon the ground of self-incrimination, as a test of credibility, is contained in Raffel v. United States, supra, 271 U.S. at page 497, 46 S.Ct. 566, 70 L.Ed. 1054. As was stated in the Raffel case, when a defendant takes the stand in his own behalf he does so as does any other witness. Since such is his position the jury is entitled to draw the inference if the facts warrant it that a defendant is claiming privilege in bad faith, not because he seeks to avoid admission of guilt of a crime with which he is charged and for which he is not being tried, but to avoid the embarrassing consequences of truthful answers at the trial at which he is testifying. In view of the questions asked Johnson and which he refused to answer under his claim of privilege, we think the trial court committed no error in instructing the jury that they might consider the defendant's good faith and credibility in asserting his privilege.

The trial was a protracted one. At times a considerable degree of heat was engendered between counsel. During their respective summations both the attorney for the defendant and the attorney for the United States went further than the rules of fair argument would allow. Since the defendant was convicted, it is not necessary to deal specifically with any parts of the closing speech of the defendant's counsel. We wish, however, to point out certain language used by the prosecuting attorney in his summation and expressly to condemn it. He stated, "The acknowledgment of this defendant that he openly violated the laws of the State of New Jersey for all these years cannot leave any other decision in your mind but that he willingly and intentionally violated the income tax laws of this country." This argument is a complete

non sequitur. It is unfair because it contends that when a man admits that he is guilty of a crime he therefore must be deemed guilty of another crime.

 The prosecuting attorney also argued to the jury "* * * that that defendant had dragged the Republican Party of Atlantic County down into the mire * * *" and that the jury should save the people of Atlantic County from the disgrace of having Johnson as their leader. It is only fair to say that the attorney for the government at this juncture was endeavoring to counteract certain extreme statements made by the defendant's counsel. This is no excuse, however, and the argument which we have just referred to should not have been made. The jury represented a fair cross-section of the local community and we cannot conclude that, inured as is this part of the United States to the ordinary language of politics that the members attached any great importance to the argument.

We conclude that what the prosecuting attorney said to the jury would not warrant a new trial. The charge of the court was fair and adequate and carefully calculated to counteract the improper arguments of both counsel.

We have examined the transcript in this case. We have considered all of the objections raised by the appellant. We can perceive no error in the record sufficient to justify a reversal of the judgment of conviction. The appellant received substantial justice.

The judgment will be affirmed.

GOODRICH, Circuit Judge (concurring).

The affirmance of the judgment of the trial court in this case seems to me correct. However, I believe the rule laid down concerning the right of the defendant to be present in court is somewhat overelaborate and, therefore, a possible source of misunderstanding. In Snyder v. Massachusetts, supra, 291 U.S. at page 129, 54 S.Ct. at page 341, 78 L.Ed. 674, 90 A.L.R. 575, Mr. Justice Roberts, speaking for the dissenters, said: "The trial as respects the prisoner's right of presence in the Constitutional sense, does not include the formal procedure of indictment or preliminary steps antecedent to the hearing on the merits, or stages of the litigation after the rendition of the verdict, but does comprehend the inquiry by the ordained trier of

fact from beginning to end." (See, also, similar language 291 U.S. at page 132, 54 S.Ct. at page 342, 78 L.Ed. 674, 90 A.L.R. 575.) The basis of dissent was that the majority said that due process of law was not violated when the defendant got something less than this, but neither majority nor minority held that he should be given more. This is what the defendant, here, seeks when he complains of his absence during a discussion of a question of law in the courtroom when the jury was not present. It seems to me there was no violation of constitutional guarantees in this.

JONES, Circuit Judge (dissenting).

As I view the record in this case, the government's cross-examination of the defendant so far exceeded the bounds of proper interrogation as, veritably, to work a denial of the fair trial to which the accused was entitled. If such is the case, then nothing less than a new trial can suffice to eradicate the harm of the error for it goes to a matter of substantial rights.

The indictment upon which the defendant was tried specifically charged him with willful and fraudulent evasion of taxes on his income for the years 1935, 1936 and 1937, *and for no other year*. Despite the permissible limits to pertinent trial inquiry thus set by the indictment, government counsel essayed (and was permitted over objection) to cross-examine the defendant with respect to his receipts of certain income and his return thereof for the year *1938*, a year wholly unrelated to the charges in issue. The impropriety of this action and the further trial error to which it directly led will become the more apparent upon further reference to the record.

The government in its case in chief proved by members or representatives of a syndicate of "numbers writers" (lottery operators) that they had given the defendant (a political figure of apparently considerable power with local civil officers) a specified sum of money each week of the three years covered by the indictment down to November 1, 1937, for the purpose of securing "protection" against police interference with their "numbers" operations. It was the government's further contention that the tax returns filed by the defendant for the years in question failed to reflect or account for the moneys so received by him.

The defendant, as a witness in his own behalf, admitted his receipt of the moneys

from the "numbers writers" in the amounts and over the periods of time as proven by the government's witnesses. He further testified that the money had been given to him as contributions to aid him in maintaining his political organization and that, after making certain disbursements therefrom for political purposes, he had accounted for the residue in his respective income tax returns for the relevant years in a net lump sum designated "Commissions". Albeit the defendant thus ascribed to himself innocent motives in his receipt and disposition of "numbers" money, the effect of his testimony was none the less to admit, without any variation, the government's proofs as to the defendant's income receipts for the years covered by the indictment. And so, the facts with respect to the "numbers" source of the defendant's income for 1935, 1936 and 1937 were, for all practical purposes, removed from dispute by the defendant's admissions. At the same time, the defendant had not been asked in direct examination, nor did he then testify, with respect to his income for any years other than those specified in the indictment.

Nevertheless government counsel, for the avowed purpose of impeaching the defendant's credibility, asked him in cross-examination whether he had received moneys from the "numbers writers" in the year 1938. This was promptly objected to by defendant's counsel as improper in that it served to inject collateral matter which could not be availed of by the cross-examiner as the basis for impeachment, and, further, in that it introduced facts tending to show an additional criminal charge (under the government's own theory) not covered by the indictment upon which the defendant was then being tried. The defendant further pointed out that the testimony of a government witness in the case had already disclosed that the defendant's income tax return for the year 1938 was at that very time the subject matter of a separate investigation by government agents. As a corollary, the defendant urged that, obviously, he had legally sufficient reason not to testify with respect to income matters for the year 1938, for which he might possibly be indicted later.

The learned trial judge permitted the cross-examination on the theory that the matter inquired about (the defendant's receipt of "numbers" money in *1938*) and a possible answer to an anticipated succeeding question as to whether the defendant had reported as "Commissions" in his income tax return for 1938 any receipts of "numbers" money in that year would go to affect his credibility either by contradicting him on the actual basis of his 1938 tax return depending upon what he testified with respect thereto, or by casting doubt on his testimony with respect to his tax returns for 1935, 1936 and 1937 if it should develop that he had not returned in similar manner for 1938 moneys received from like sources in that year.

It is less than clear to me how the matter thus inquired about can be deemed capable of serving as the basis for impeachment. Necessarily, even a possibility of refutation would depend upon how the defendant testified in such regard. If he told the truth, he could hardly be thought to have impeached himself even though a conflict should incidentally develop upon a comparison of his testimony with extraneous matter. Yet, the irrelevant matter, which on the government's theory would constitute a separate offense for which the defendant was not on trial, would have been heard by the jury. On the other hand, if he testified falsely, the government would not be in position to refute him, for the cross-examiner is bound by the answers which he elicits to questions concerning collateral matter.

In Cohen v. United States, 1 Cir., 56 F.2d 28, 30, where the circumstances were sufficiently similar to the present as to render the language of the court in that case pertinent here, Judge Bingham said (56 F.2d at page 30):

"Then, again, the course pursued in the cross-examination of the defendant was wholly improper and prejudicial. The subject-matter then inquired into had not been alluded to in the direct examination. The inquiry related to an entirely immaterial matter arising two years or more after the occurrence of the crime charged, and had no possible relation to it. The government having, on cross-examination, elicited information as to the defendant's occupation and the work he had done the day before—immaterial matters—was bound by his answers. It could not then undertake to contradict him as to these matters, as was done, for the purpose of disparaging his credibility.

"If testimony in relation to an immaterial matter is elicited upon cross-examination, it is not open to contradiction for the purpose of disparaging the credibility of the witness."

Again, in Bullard v. United States, 4 Cir., 245 F. 837, 840, where a defendant was on trial for illicit distilling, government counsel was permitted upon cross-examination of the defendant to interrogate him concerning certain offenses not covered by the indictment. Speaking for the Court of Appeals, Judge Knapp said (245 F. at page 840) that "We are not aware of any theory upon which this ruling can be defended. The subject-matter of the question addressed to Bullard [the defendant] was obviously collateral to the issue on trial and *the government was bound by his answer.*" (Emphasis supplied.) That the extraneous cross-examination in that case constituted reversible error was said to be "an unavoidable conclusion".

Here, the learned trial judge overruled the objection, and the defendant answered, admitting that he had received "numbers money" in 1938. Immediately thereupon, government counsel asked him "Who gave it to you?" Vigorous objection by defendant's counsel to this question led to argument during which the jury and the defendant were absent from the court room under circumstances which the majority opinion fully relates incidental to another question. In the end the trial court overruled the defendant's objection to this question but suggested that the defendant could justify a refusal to answer such questions by pleading, if he were so disposed, a witness' privilege against self-incrimination. Of course, if the matter was relevant and proper, the defendant was not entitled to plead the constitutional privilege. When a defendant voluntarily offers himself as a witness, he waives his privilege against self-incrimination and may be cross-examined like any other witness within the limits of the appropriate rules of evidence. Raffel v. United States, 271 U.S. 494, 497, 46 S.Ct. 566, 70 L.Ed. 1054. In fact, not even skillful guidance by his counsel in direct examination can save a defendant from relating fully under cross-examination all matter within his knowledge which is relevant and material to the case. Integrity for the oath, which he takes as a witness, to tell the whole truth,

so contemplates. Indeed, the action of the learned trial court in according to the defendant, as a witness, a right to plead privilege against self-incrimination seems but a tacit recognition that the matter inquired about was collateral to the issues for, otherwise, the defendant was bound to answer.

Upon a resumption of the testimony the question—"Who gave it to you?"—was renewed and the defendant refused to answer, claiming privilege against self-incrimination. Then followed several other questions by government counsel concerning defendant's income practices and tax return for the year 1938. In each of these instances relating to the year 1938 the defendant refused to answer on the ground that to do so would tend to incriminate him; and the court accepted the plea as justification for the defendant's refusal to answer.

While, in general, one might reasonably conclude that it adversely affects a defendant's substantial rights to force him to the point of pleading privilege against self-incrimination in order to avoid answering questions which have no proper place in the case, and should never have been asked, we are not left merely to inference for a perception of the prejudice engendered in this case on account of the defendant's refusal to answer the questions respecting his 1938 income. The summation[1] of government counsel was a deliberate and unmistakable exhortation to the jury to find the defendant unworthy of credit because he had plead privilege against self-incrimination in order not to answer questions as to his 1938 income receipts. Counsel for the defendant made due complaint of this argument for the government, and the trial court undertook in his charge to the jury to offset its harmful effect. But, instead of neutralizing what government counsel had improperly thus argued to the jury, the learned trial judge actually gave the argument added weight by telling the jury that the defendant's refusal to answer questions concerning his 1938 income could "be considered by you [the jury] in testing his [the defendant's] credibility as to the

---

[1] Government counsel thus argued to the jury,—"Now, ladies and gentlemen, can you believe that man told you the truth about anything on the witness stand when he admits that he got numbers money in 1938 but won't tell you who he got it from on the ground it would incriminate him? If you can believe that that man is innocent of this charge when he stands right up in front of you and says he cannot answer a question about 1938, that he just got through answering for 1937 on the ground it would incriminate him, well, then, I just don't get it."

answers which he did give and his good faith in the matter."

The majority of the court dispose of this by saying that they "can perceive no reason why the fact that a defendant refuses to answer pertinent and proper questions upon cross-examination should not be considered by the jury in testing his good faith and credibility." The answer to that conclusion is that, if the cross-examination is "pertinent and proper", a defendant witness gets no opportunity to refuse to answer either by pleading privilege against self-incrimination or otherwise. Cf. Raffel v. United States, supra. But having been allowed by the court so to plead in this case, surely the defendant did not thereby subject himself to impeachment merely because he exercised a privilege which the court, even though mistakenly, accorded to him. The majority concede that the trial court "probably erred" in permitting the defendant to refuse to answer on the ground of privilege against self-incrimination but say that "this worked in Johnson's [the defendant's] favor." If so, it was indeed a "favor" of less than doubtful value when government counsel was able to argue to the jury that the refusal to answer for the reason assigned constituted impeaching conduct and was substantially confirmed in this argument by the charge of the court.

Nor do I think that Raffel v. United States, supra, contains any implication that a refusal to answer on a plea of self-incrimination may serve as a basis for impeachment. Under the decision in that case, the situation never arises where a defendant witness can plead privilege against self-incrimination. The Raffel case contemplates that the defendant witness will be interrogated "within the limits of the appropriate rules." And, to that extent, he is bound to answer all pertinent and proper questions. How, then, could a defendant as a witness lay himself open to any imputation for refusing to answer when he is legally incapable of so refusing? In any event, I am unwilling to accede to the view that one's permitted invocation of a constitutional privilege carries with it a legal stigma at any time.

In my opinion, it was substantial error for the trial court to permit government counsel, over objection, to cross-examine the defendant on the collateral matter relating to a possible separate offense which could not in any case afford a legal basis for impeachment and likewise error for

government counsel to argue to the jury, uncorrected, a want of credibility in the defendant because of his plea of self-incrimination in refusing to answer questions as to the collateral matter. Either the defendant should have been required to answer or have been relieved from answering, depending upon whether the court ruled the questions proper or improper. But he should not be held to have impeached himself by refusing to answer on a basis advanced and accepted by the trial court.

In the opinion overruling the defendant's motion for a new trial the court below gave a further reason in support of the questions asked of the defendant in cross-examination as to his 1938 income receipts from "numbers money". The argument is there made that as the defendant denied having received any payments from the "numbers" operators in November and December 1937, his admission of such receipts for the first ten months of 1937 and like admission as to 1938 warranted the jury in inferring that he had received similar payments in November and December 1937. In view of the fact that the government's own proofs did not show that the defendant had received any such payments in November and December 1937, the suggested inference would be no more than a guess and, at that, a guess which would not even tend to corroborate any evidence in the case.

In concluding that the defendant is entitled to a new trial, I am not unmindful of the statute which requires that the trial error justifying reversal must be other than technical errors or defects which do not affect the substantial rights of the parties. Act of Mar. 3, 1911, c. 231, § 269, as amended by the Act of Feb. 26, 1919, c. 48, 40 Stat. 1181, 28 U.S.C.A. § 391. The errors to which reference has already been made did affect the substantial rights of the defendant. Cf. Williams v. Great Southern Lumber Co., 277 U.S. 19, 26, 48 S.Ct. 417, 72 L.Ed. 761.

In no event was the amendment of February 26, 1919, intended to, nor does it, invest a court with power to affirm a judgment merely because the court happens to divine that the jury was unaffected by the particular error and that the verdict would have been the same had the error not been committed. Any assumption of such power can stem only from an unwarranted emphasis upon the "technical error" portion of the statute without regard for the effect of the error upon the substantial

rights of the complaining party. True enough, the crucial thing, which makes the amendment of Feb. 26, 1919, applicable in any case, is that the error assigned is technical or, as has been aptly said, is concerned with "the mere etiquette of trials and with the formalities and minutiae of procedure". See Bruno v. United States, 308 U.S. 287, 294, 60 S.Ct. 198, 200, 84 L.Ed. 257. Such, indeed, are the conditions which call into play the court's exercise of its duty to say whether the error, being technical, affected substantial rights. But, where substantial rights are affected by trial error, the law forthwith imputes to the error the harm which renders the resultant judgment a nullity, regardless of the form of the error. McCandless v. United States, 298 U.S. 342, 347, 348, 56 S.Ct. 764, 80 L.Ed. 1205; Williams v. Great Southern Lumber Co., loc. cit. supra; United States v. River Rouge Improvement Co., 269 U.S. 411, 421, 46 S.Ct. 144, 70 L.Ed. 339.

This rule is no less applicable to criminal trials where jeopardy of life or limb is involved. Criminality is to be tried and adjudged according to legal standards which should be as fixed and unvarying in their general application as is humanly possible. Such, however, would not be the case if a finding of guilt may be affirmed according to the predilection or whim of any one person. Even judges may not spy out guilt unerringly or appraise with certainty just what enters into a jury's deliberations in arriving at a verdict. Except where a jury trial is expressly waived, the facts and inferences should be left with the jury.

It may very well be that the defendant in this case is guilty of the offenses precisely as charged by the government, but the appropriate function of a reviewing court is to determine whether applicable legal standards were fully and fairly complied with at trial in respect of the defendant's substantial rights. Nor may the notoriety of a particular defendant ever dissuade from a dispassionate inquiry into the merit of his timely complaint. While, quite understandably, any question as to the fairness of a trial is of immediate and direct concern to the convicted defendant, its wider importance lies in its significance to the public at large. The rights of all are adversely affected when the rights of one are substantially impaired or disregarded. And this is especially true if the impairment or want of regard transpires under legal forms.

The conclusion herein reached renders unnecessary discussion or consideration of the exclusion of the defendant from the court room during the argument on the question of evidence in respect of the government's cross-examination of the defendant. However, it may not be inappropriate to say that I, too, deem a defendant's right to be present throughout his trial to be absolute. Any discriminations or refinements as to what does or does not constitute the trial, once the jury is impanelled, the verdict unreturned and the court in session and actually engaged in a disposition of the matter, are likely only to render that right something less than absolute. Furthermore, I think it is immaterial whether the defendant, when directed by the court to retire from the court room, departed without objecting. It is imputing responsibility rather summarily to say that a defendant's unquestioning compliance with a court's order at trial implies his acquiescence in the propriety of the order. Any waiver implied from the defendant's submission under the circumstances should not be invoked to dissipate a constitutional right. Cf. Hopt v. Utah, 110 U.S. 574, 579, 4 S.Ct. 202, 28 L.Ed. 262.